# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 18, 2010           Decided June 29, 2010

No. 09-5092

GENERAL ELECTRIC COMPANY,
APPELLANT

v.

LISA PEREZ JACKSON, ADMINISTRATOR, U.S.
ENVIRONMENTAL PROTECTION AGENCY AND ENVIRONMENTAL
PROTECTION AGENCY,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:00-cv-02855-JDB)

———

*Carter G. Phillips* argued the cause for appellant. With him on the briefs were *Donald W. Fowler* and *Eric G. Lasker*. *Thomas G. Echikson* entered an appearance.

*Martin S. Kaufman* and *Quentin Riegel* were on the brief for *amicus curiae* National Association of Manufacturers in support of appellant.

*Robin S. Conrad*, *Amar D. Sarwal*, *Paul D. Clement*, *Daryl L. Joseffer*, and *Charles Fried* were on the brief for

*amicus curiae* Chamber of Commerce of the United States of America in support of appellant.

*Sambhav N. Sankar*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *John C. Cruden*, Deputy Assistant Attorney General.

*Christopher J. Wright* was on the brief for *amici curiae* Natural Resources Defense Council, et al. in support of appellees.

Before: ROGERS, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In this case, appellant challenges the constitutionality of a statutory scheme that authorizes the Environmental Protection Agency to issue orders, known as unilateral administrative orders (UAOs), directing companies and others to clean up hazardous waste for which they are responsible. Appellant argues that the statute, as well as the way in which EPA administers it, violates the Due Process Clause because EPA issues UAOs without a hearing before a neutral decisionmaker. We disagree. To the extent the UAO regime implicates constitutionally protected property interests by imposing compliance costs and threatening fines and punitive damages, it satisfies due process because UAO recipients may obtain a pre-deprivation hearing by refusing to comply and forcing EPA to sue in federal court. Appellant insists that the UAO scheme and EPA's implementation of it nonetheless violate due process because the mere issuance of a UAO can inflict immediate, serious, and irreparable damage by depressing the recipient's stock price, harming its brand value, and increasing its cost of financing. But such "consequential" injuries—injuries resulting not from EPA's

issuance of the UAO, but from market reactions to it—are insufficient to merit Due Process Clause protection. We therefore affirm the district court's grant of summary judgment to EPA.

## I.

Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) "in response to the serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). CERCLA seeks to promote prompt cleanup of hazardous waste sites and to ensure that responsible parties foot the bill. *See, e.g.*, *Gen. Elec. Co. v Whitman* (*GE I*), 257 F. Supp. 2d 8, 12 (D.D.C. 2003). Although CERCLA speaks in terms of the President, the President has delegated his UAO authority to EPA, so throughout this opinion we shall refer only to EPA. *See* Exec. Order No. 12,580, 52 Fed. Reg. 2923 (Jan. 23, 1987).

Under CERCLA, EPA may itself conduct, or may order responsible parties to conduct, two types of "response actions": removal actions are short-term remedies "designed to cleanup, monitor, assess, and evaluate the release or threatened release of hazardous substances," while remedial actions are "longer-term, more permanent remedies to 'minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.'" *Gen. Elec. Co. v. EPA* (*GE II*), 360 F.3d 188, 189 (D.C. Cir. 2004) (per curiam) (quoting 42 U.S.C. § 9601); *see also* 42 U.S.C. § 9604 (providing authority for removal and remedial actions). CERCLA imposes strict liability on several classes of responsible parties, including current and former facility owners and operators, as well as parties that "arrange[] for"

the transport, treatment, or disposal of hazardous substances. 42 U.S.C. § 9607.

When EPA determines that an environmental cleanup is necessary at a contaminated site, CERCLA gives the agency four options: (1) it may negotiate a settlement with potentially responsible parties (PRPs), *id.* § 9622; (2) it may conduct the cleanup with "Superfund" money and then seek reimbursement from PRPs by filing suit, *id.* §§ 9604(a), 9607(a)(4)(A); (3) it may file an abatement action in federal district court to compel PRPs to conduct the cleanup, *id.* § 9606; or (4) it may issue a UAO instructing PRPs to clean the site, *id.* This last option, authorized by CERCLA section 106, is the focus of this case.

To use its UAO authority, EPA must first determine "that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility." *Id.* If EPA makes such a determination, it must then compile an administrative record and select a response action. *Id.* § 9613(k)(1). For remedial actions, the longer-term option, CERCLA requires EPA to "provide for the participation of interested persons, including [PRPs], in the development of the administrative record." *Id.* § 9613(k)(2)(B). Specifically, EPA must provide "[n]otice to potentially affected persons and the public," "[a] reasonable opportunity to comment and provide information regarding the [remedial] plan," "[a]n opportunity for a public meeting in the affected area," "[a] response to each of the significant comments, criticisms, and new data submitted in written or oral presentations," and "[a] statement of the basis and purpose of the selected action." *Id.*; *see also* § 9617(a)–(b) (requiring public notice of all remedial actions). EPA regulations also require public notice and comment for the

shorter-term removal actions. *See* 40 C.F.R. §§ 300.415(n) (requiring community notice of removal actions), 300.810–300.820 (describing contents of administrative record and mandating public comment period for remedial and removal actions).

Once EPA issues a UAO, the recipient PRP has two choices. It may comply and, after completing the cleanup, seek reimbursement from EPA. 42 U.S.C. § 9606(b)(2)(A). If EPA refuses reimbursement, the PRP may sue the agency in federal district court to recover its costs on the grounds that (1) it was not liable for the cleanup, *id.* § 9606(b)(2)(B)–(C); or (2) it was liable but EPA's selected response action (or some portion thereof) was "arbitrary and capricious or . . . otherwise not in accordance with law," *id.* § 9606(b)(2)(D). Alternatively, the PRP may refuse to comply with the UAO, in which case EPA may either bring an action in federal district court to enforce the UAO against the noncomplying PRP, *id.* § 9606(b)(1), or clean the site itself and then sue the PRP to recover its costs, *id.* § 9607(c)(3). In either proceeding, if the court concludes that the PRP "willfully" failed to comply with an order "without sufficient cause," it "may" (but need not) impose fines, *id.* § 9606(b)(1), which are currently set at $37,500 per day, *see* 73 Fed. Reg. 75,340, 75,340–46 (Dec. 11, 2008), and accumulate until EPA brings a recovery or enforcement action—a period of up to six years, *see* 28 U.S.C. § 2462 (statute of limitations for enforcement action is five years from the date a PRP violates a UAO); 42 U.S.C. § 9613(g)(2) (statute of limitations for recovery of costs is three years for a removal action and six years for a remedial action). If EPA itself undertakes the cleanup and the district court finds that the PRP "fail[ed] without sufficient cause" to comply with the UAO, the court "may" impose punitive damages of up to "three times[] the amount of any costs" the agency incurs. 42 U.S.C. § 9607(c)(3).

Central to this case, these two options—comply and seek reimbursement, or refuse to comply and wait for EPA to bring an enforcement or cost recovery action—are exclusive. CERCLA section 113(h) bars PRPs from obtaining immediate judicial review of a UAO. *Id.* § 9613(h). *See generally Reardon v. United States*, 947 F.2d 1509, 1512 (1st Cir. 1991) (en banc). That section provides that "No Federal court shall have jurisdiction . . . to review any order issued under section [106]" until the PRP completes the work and seeks reimbursement, *id.* § 9613(h)(3), or until EPA brings an enforcement action or seeks to recover fines and damages for noncompliance, *id.* § 9613(h)(1)–(2).

Over the years, appellant General Electric (GE) has received at least 68 UAOs. *See Gen. Elec. Co. v. Jackson (GE IV)*, 595 F. Supp. 2d 8, 17 (D.D.C. 2009). In addition, GE "is currently participating in response actions at 79 active CERCLA sites" where UAOs may issue, Reply Br. 22, including the cleanup of some 200 miles of the Hudson River stretching from Hudson Falls to the southern tip of Manhattan. According to EPA and its amicus, from 1947 to 1977, two GE manufacturing plants near Hudson Falls contributed to the river's pollution by discharging polychlorinated biphenyls, considered a probable human carcinogen. Nat'l Res. Def. Council et al. Amicus Br. 2 ("NRDC Amicus Br."); *see also United States v. Gen. Elec. Co.*, 460 F. Supp. 2d 395, 396 (N.D.N.Y. 2006). Although EPA has yet to issue GE a UAO for the Hudson River, the agency has reserved the right to do so, *see* NRDC Amicus Br. 7, and the company suspects it will receive UAOs at other sites as well.

In 2000, GE filed suit in the United States District Court for the District of Columbia challenging CERCLA's UAO regime. In its amended complaint, GE alleged that the statute

violates the Fifth Amendment to the United States Constitution because it "deprive[s] persons of their fundamental right to liberty and property without . . . constitutionally adequate procedural safeguards." Am. Compl. ¶ 2. According to GE, "[t]he unilateral orders regime . . . imposes a classic and unconstitutional Hobson's choice": because refusing to comply "risk[s] severe punishment [i.e., fines and treble damages]," UAO recipients' only real option is to "comply . . . before having any opportunity to be heard on the legality and rationality of the underlying order." *Id.* ¶ 4. GE also alleged that it "has been and is aggrieved by CERCLA's fundamental constitutional deficiencies" because it has repeatedly received UAOs and is likely to receive them in the future. *Id.* ¶ 7; *see also id.* ¶¶ 31–47. GE sought "[a] declaratory judgment that the provisions of CERCLA relating to unilateral administrative orders . . . are unconstitutional." *Id.* Prayer for Relief ¶ 1.

The district court dismissed GE's amended complaint for lack of jurisdiction. According to the district court, section 113(h) prohibits "broad, pre-enforcement due process challenge[s] to the statute . . . until EPA seeks enforcement or remediation is complete" on a particular UAO. *GE I*, 257 F. Supp. 2d at 31. We reversed, ruling that section 113(h) presented no bar to GE's lawsuit because the company "does not challenge any particular action or order by EPA." *GE II*, 360 F.3d at 191.

On remand, the district court issued two decisions that GE now appeals. In the first, issued in 2005, the district court granted EPA's motion for summary judgment on GE's facial due process challenge. *Gen. Elec. Co. v. Johnson* (*GE III*), 362 F. Supp. 2d 327 (D.D.C. 2005). The district court held that the statute provides constitutionally sufficient process because by refusing to comply with a UAO, a PRP can force

EPA to bring a court action in which the PRP can challenge the order. The court also rejected GE's claim that CERCLA's fines and treble damages are so severe that, as a practical matter, they foreclose judicial review. In the alternative, the district court applied the "*Salerno* doctrine," which prohibits facial invalidation of a statute unless the statute "is unconstitutional in every application." *Id.* at 343; *see United States v. Salerno*, 481 U.S. 739, 745 (1987). According to the court, even if CERCLA's fines and damages make pre-compliance review unavailable as a practical matter, the statute can still be applied constitutionally in emergency situations. Finally, the district court concluded that it had jurisdiction to address what it called GE's "pattern and practice" challenge to EPA's administration of CERCLA's UAO provisions, i.e., GE's argument that EPA's policies and procedures for issuing UAOs exacerbate CERCLA's constitutional deficiencies, and it allowed discovery on that claim to proceed. *GE III*, 362 F. Supp. 2d at 333–37.

Following discovery, the district court granted EPA's motion for summary judgment on the pattern and practice challenge as well. The court began by finding that certain "consequential injuries" that PRPs allegedly suffer as a result of UAOs—including decline in stock price, loss of brand value, and increased cost of financing—qualify as property interests entitled to due process protection. *GE IV*, 595 F. Supp. 2d at 20–21. What's more, the court found that GE had shown that harm to these interests was "significant," because noncomplying PRPs suffer millions of dollars in damages to brand and market value. *Id.* at 30. The district court nonetheless concluded that the significance of these interests, when balanced against the government's interest and the risk of error in UAO procedures, was insufficient to render EPA's practices unconstitutional. *Id.* at 32–39; *see Matthews v. Eldridge*, 424 U.S. 319 (1976).

GE appeals both decisions. We review the district court's entry of summary judgment de novo. *See, e.g.*, *Capitol Hill Group v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 489 (D.C. Cir. 2009).

## II.

We begin with GE's facial challenge. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745. Although the precise standard for facial challenges remains "a matter of dispute," *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010), to prevail GE must establish either "'that no set of circumstances exists under which [CERCLA's UAO provisions] would be valid,' or that [those provisions] lack[] any 'plainly legitimate sweep,'" *id.* (quoting *Salerno*, 481 U.S. at 745, and *Washington v. Glucksberg*, 521 U.S. 702, 740 n. 7 (1997) (Stevens, J., concurring in the judgments) (citation omitted)); *see Troxel v. Granville*, 530 U.S. 57, 85 (2000) (Stevens, J., dissenting) (explaining that facial invalidation is inappropriate under the "plainly legitimate sweep" standard where the statute's application would be constitutional "in many circumstances").

The Fifth Amendment to the United States Constitution provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.' Only after finding the deprivation of a protected interest do we look to see if the [government's] procedures comport with due process." *Amer. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted). At this second step, we apply the now-familiar *Matthews v. Eldridge* balancing test, considering (1) the significance of the private party's protected interest, (2) the government's

interest, and (3) the risk of erroneous deprivation and "the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335.

GE asserts that UAOs deprive PRPs of two types of protected property: (1) the money PRPs must spend to comply with a UAO or the daily fines and treble damages they face should they refuse to comply; and (2) the PRPs' stock price, brand value, and cost of financing, all of which, GE contends, are adversely affected by the issuance of a UAO. We address each of these alleged deprivations in turn.

*Costs of Compliance, Fines, and Damages*

The parties agree that the costs of compliance and the monetary fines and damages associated with noncompliance qualify as protected property interests. They disagree, however, as to whether judicial review is available before any deprivation occurs. EPA contends that CERCLA gives PRPs the right to pre-deprivation judicial review: by refusing to comply with a UAO, a PRP can force EPA to file suit in federal court, where the PRP can challenge the order's validity before spending a single dollar on compliance costs, damages, or fines. GE responds that noncompliance—and thus pre-deprivation judicial review—is but a theoretical option. According to GE, daily fines and treble damages "are so severe that they . . . intimidate[] PRPs from exercising the purported option of electing not to comply with a UAO so as to test an order's validity" via judicial review. Appellant's Br. 49. PRPs are thus forced to comply and spend substantial sums prior to any hearing before a neutral decisionmaker. Because "the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to a final deprivation of a property interest," GE argues, CERCLA's failure to provide any realistic avenue for pre-deprivation review is fatal to the Act's constitutionality.

Appellant's Br. 24 (quoting *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991)) (internal quotation marks omitted).

GE's argument hinges on the Supreme Court's decision in *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny. Under those cases, a statutory scheme violates due process if "the penalties for disobedience are by fines so enormous . . . as to intimidate the [affected party] from resorting to the courts to test the validity of the legislation [because] the result is the same as if the law in terms prohibited the [party] from seeking judicial [review]" at all. *Id.* at 147. The Supreme Court has made clear, however, that statutes imposing fines—even "enormous" fines—on noncomplying parties may satisfy due process if such fines are subject to a "good faith" or "reasonable ground[s]" defense. *See Reisman v. Caplin*, 375 U.S. 440, 446–50 (1964); *Okla. Operating Co. v. Love*, 252 U.S. 331, 338 (1920). Courts have also held that "there is no constitutional violation if the imposition of penalties is subject to judicial discretion." *Wagner Seed Co. v. Daggett*, 800 F.2d 310, 316 (2d Cir. 1986); *cf. Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1121 & n.8 (2d Cir. 1975).

CERCLA guarantees these safeguards. Indeed, the statute offers noncomplying PRPs several levels of protection: a PRP faces daily fines and treble damages only if a federal court finds (1) that the UAO was proper; (2) that the PRP "willfully" failed to comply "without sufficient cause"; and (3) that, in the court's discretion, fines and treble damages are appropriate. 42 U.S.C. §§ 9606(b)(1), 9607(c)(3). As to the first of these findings—the propriety of the UAO—the district court reviews EPA's determination de novo: although the PRP must prove that it is not liable by a preponderance of the evidence, EPA's liability determination warrants no judicial deference. *See Kelley v. EPA*, 15 F.3d 1100, 1107–08 (D.C.

Cir. 1994) ("Congress . . . designated the courts and not EPA as the adjudicator of the scope of CERCLA liability."). As to the second, CERCLA's "willfulness" and "sufficient cause" requirements are quite similar to the good faith and reasonable grounds defenses the Supreme Court has found sufficient to satisfy due process, and GE does not argue otherwise. *See Resiman*, 375 U.S. at 446–50 (penalty for challenging a summons did not violate due process where fines were unavailable for a good-faith challenge); *Okla. Operating Co.*, 252 U.S. at 337 (permanent injunction against enforcement of daily fines for noncompliance with allegedly confiscatory rates would be appropriate if "plaintiff had reasonable ground to contest" them); *see also Solid State Circuits, Inc. v. EPA*, 812 F.2d 383, 391–92 (8th Cir. 1987) (finding that CERCLA's "sufficient cause" defense is constitutionally equivalent to a good faith defense and thus satisfies due process). Moreover, PRPs receive added protection from the fact that the district court has authority to decide not to impose fines even if it concludes that a recipient "without sufficient cause, willfully violate[d], or fail[ed] or refuse[d] to comply with" a UAO. 42 U.S.C. § 9606(b)(1); *see also id.* § 9607(c)(3) (district court "may" impose treble damages if a person "who is liable . . . fails without sufficient cause" to comply with a UAO). Given these safeguards, we have no basis for concluding that "[t]he necessary effect and result of [CERCLA] must be to preclude a resort to the courts . . . for the purpose of testing [a UAO's] validity." *Young*, 209 U.S. at 146. Contrary to GE's claim, then, PRPs face no Hobson's choice. We therefore join three of our sister circuits that have rejected similar *Ex Parte Young* challenges to CERCLA's UAO regime. *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 664 (7th Cir. 1995); *Solid State Circuits*, 812 F.2d at 391–92; *Wagner Seed Co.*, 800 F.2d at 316; *see also City of Rialto v. West Coast Loading Corp.*, 581 F.3d 865, 872 (9th Cir. 2009) (expressing approval of this

holding); *cf. S. Pines Assocs. v. United States*, 912 F.2d 713, 717 (4th Cir. 1990) (rejecting due process challenge to Clean Water Act compliance orders because recipients are "not subject to . . . penalties until EPA pursues an enforcement proceeding.").

Given the foregoing, we need not address EPA's argument that the statute is, at a minimum, constitutional in emergency situations.  Nor for the same reason need we consider GE's response that EPA does not actually issue UAOs in emergencies.

*Stock Price, Brand Value, and Cost of Financing*

GE contends that, in addition to potential cleanup costs, fines, and damages, issuance of a UAO "immediately tag[s]" a PRP "with a massive contingent liability," Appellant's Br. 14, which in turn depresses its stock price, harms its brand value, and increases its cost of financing.  According to GE, these adverse impacts are "irreparable and cannot be remedied through a later, delayed challenge to [a] UAO." *Id.* at 34. Perhaps so, but we must first address an antecedent question: does the Due Process Clause protect PRPs' interest in the market's assessment of their stock, brand, and credit worthiness? *See supra* at 9–10.

As the Supreme Court has repeatedly stated, "the range of interests protected by procedural due process is not infinite." *E.g.*, *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972).  Moreover, "[p]roperty interests . . . are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577; *see also Paul v. Davis*, 424 U.S. 693, 710 (1976).  For due process

purposes, then, it is not enough that one has "an abstract need or desire" for the asserted property; to merit due process protection, "[h]e must . . . have a legitimate claim for entitlement to it." *Roth*, 408 U.S. at 577.

GE points to no "independent source such as state law," *id.*, for its purported property interests. Nor does it deny, as EPA points out, that the company's claimed injuries are consequential, i.e., that they result not from EPA's "extinguish[ing] or modify[ing] a right recognized by state law," but rather from independent market reactions to the issuance of a UAO. Appellees' Br. 26. GE argues only that the Supreme Court and this court have "repeatedly held that consequential impacts can constitute a deprivation." Reply Br. 6.

In support, GE relies primarily on *Connecticut v. Doehr*, 501 U.S. 1 (1991), in which the Supreme Court held that a state statute authorizing ex parte prejudgment attachment of real estate violated due process. GE emphasizes the Court's statement that

> [T]he property interests that attachment affects are significant. . . . [A]ttachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause.

*Id.* at 11. According to GE, because "[e]very one of the deprivations identified by the Court . . . entailed nothing but consequential market reactions to the attachment," Reply Br. 6, *Doehr* stands for the proposition that consequential injuries

merit due process protection. GE also relies on the Court's statement that although the effects of attachment "do not amount to a complete, physical, or permanent deprivation of real property[,] . . . the Court has never held that only such extreme deprivations trigger due process concern." 501 U.S. at 12. Indeed, the Court continued, "even the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection." *Id.* This language, GE argues, demonstrates that PRPs are entitled to procedures that satisfy due process before EPA can issue a UAO that results in "temporary or partial impairments" to stock price, brand value, or cost of financing.

We disagree with GE's reading of *Doehr*'s discussion of consequential injuries. The quoted text comes not from the Court's analysis of *whether* attachment requires due process protection, but instead from the portion of its opinion weighing the *significance* of the private interests at stake—the first of the three factors *Matthews* instructs courts to consider when determining what process is due in situations where a constitutional deprivation has in fact occurred. *See id.* at 11. The Court addressed this latter question only after finding that real property attachments qualify as deprivations within the meaning of the Due Process Clause. *Id.* at 9 ("With this case we return to the question of what process must be afforded by a state statute enabling an individual to enlist the aid of the State to deprive another of his or her property by means of prejudgment attachment or similar procedure."). Although the Court devoted few words to this threshold inquiry, it is well accepted that attachments themselves constitute property deprivations because, as EPA points out, they "pluck a stick from the property owner's bundle and hold it as surety." Appellees' Br. 32; *see Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 932–33 (1982) (noting that "the Court has consistently

held that constitutional requirements of due process apply to garnishment and prejudgment attachment procedures"). Thus, although *Doehr* does hold that direct, partial impairments of property rights may well warrant due process safeguards, nothing in the opinion implies that consequential injuries, standing alone, merit due process protection. *See Doehr*, 501 U.S. at 29 (Rehnquist, C.J., concurring in part and concurring in the judgment) (noting that the filing of a lis pendens may reduce the market value of property without triggering due process because it "creates no additional right in the property"); *United States v. Register*, 182 F.3d 820, 836–37 (11th Cir. 1999) (same). Rather, *Doehr* stands for the proposition that consequential injuries can affect the significance of the private interests at stake and thus the nature of the procedures required.

Stripped of its reliance on *Doehr*, GE's case boils down to this: by declaring that a PRP is responsible for cleaning up a hazardous waste site, a UAO harms the PRP's reputation, and the market, in turn, devalues its stock, brand, and credit rating. Viewed this way, GE's argument is foreclosed by *Paul v. Davis*, 424 U.S. 693. There the Supreme Court held that a sheriff's inclusion of Davis's name and photograph on a flyer captioned "Active Shoplifters" implicated no due process interest. Although the poster alerted the public to a potentially damaging allegation about Davis and may have seriously limited his future employment opportunities, *id.* at 697, the Court found that it extinguished none of Davis's previously held legal rights—state "law [did] not extend to [him] any legal guarantee of present enjoyment of reputation," *id.* at 711–12. In so holding, the Court distinguished *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), which ruled that a law allowing for "posting"— forbidding the sale of alcoholic beverages to persons determined to have become hazards based on their "excessive

drinking"—violated due process. As the Court explained in *Davis*, the law at issue in *Constantineau* went beyond mere stigma, depriving the plaintiff "of a right previously held under state law . . . to purchase or obtain liquor in common with the rest of the citizenry." *Davis*, 424 U.S. at 708. "[I]t was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards" in *Constantineau*. *Id*. at 708–09. *Davis*'s rule is thus clear: stigma alone is insufficient to invoke due process protections. *See id.* at 704–06; *see also Siegert v. Gilley*, 500 U.S. 226, 234 (1991) ("[S]o long as . . . damage flows from injury caused by the defendant to a plaintiff's reputation," no constitutional claim is alleged).

Our cases elaborating on *Davis*'s so-called stigma-plus rule find it satisfied only where plaintiffs show, in addition to reputational harm, that (1) the government has deprived them of some benefit to which they have a legal right, e.g., the "right to be considered for government contracts in common with all other persons," *Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1108–09 (D.C. Cir. 1985) (quoting *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983)) (internal quotation marks omitted); or (2) the government-imposed stigma is so severe that it "broadly precludes" plaintiffs from pursuing "a chosen trade or business," *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003). Here, although a UAO may well damage the PRP's reputation, GE alleges neither of these additional injuries. This case is thus controlled by *Davis*, not *Constantineau*.

Our conclusion is unaffected by the fact that GE alleges "property" harm while *Davis* addresses a "liberty" claim. Like other circuits, we have applied the stigma-plus framework to property claims, requiring plaintiffs to show that alleged reputational harm *completely* destroys the value

of their property. For example, in *Industrial Safety Equipment Ass'n v. EPA*, 837 F.2d 1115, 1121-22 (D.C. Cir. 1988), we concluded that EPA's issuance of a report warning against the use of certain asbestos-protection respirators, but not prohibiting them, did not deprive manufacturers of their property interest in the respirators' EPA certifications. Although the report would surely make the respirators less popular and therefore less profitable, and although there was "no question that [the manufacturers] possess[ed] cognizable property interests in their respirator certifications," "[t]his indirect effect . . . [could] hardly be said to constitute a constitutional deprivation of property deserving fifth amendment protection" because it "in no way . . . rendered valueless" plaintiffs' certifications. *Id.* at 1122; *see also WMX Techs., Inc. v. Miller*, 197 F.3d 367, 373–76 (9th Cir. 1999) (en banc) (damage to business goodwill did not implicate the Due Process Clause because the asserted injury affected only reputation); *Wells Fargo Armored Serv. Corp. v. Ga. Pub. Serv. Comm'n*, 547 F.2d 938, 941 (5th Cir. 1977) (indirect injuries to property right in state motor carrier license implicate the Due Process Clause only where they "effectively render the property valueless").

The Second Circuit's application of *Davis* to a statutory scheme quite similar to CERCLA provides additional support for our conclusion. In *Asbestec Construction Services v. EPA*, 849 F.2d 765, 767, 769 (2d Cir. 1988), the court considered a due process challenge to a Clean Air Act "compliance order" that, like a UAO, found that the recipient had violated federal law, ordered specified compliance actions, and threatened "an EPA court action for relief" if the recipient failed to comply. According to the recipient, the compliance order implicated its property and liberty rights under the Fifth Amendment by "inhibit[ing] its ability to obtain asbestos removal contracts." *Id.* at 769. The Second Circuit rejected both arguments. As

to the property claim, the court noted that the recipient had pointed to no "certain benefits," such as government contracts, from which the order excluded it. *Id.* at 770. As to the recipient's liberty argument, the court concluded that "[t]he possible adverse effect of the order on petitioner's future business prospects is insufficient by itself to give rise to a claim that one has been deprived of a liberty interest." *Id.* at 769. Attempting to distinguish *Asbestec*, GE points out that the compliance order at issue there required no remedial action, but this difference is irrelevant because the property interest alleged in *Asbestec*—a right to a positive business reputation and the profits it yields—is, in essence, the same interest GE alleges here.

GE nonetheless insists that this court has "held that consequential impacts can constitute a deprivation." Reply Br. 6. The cases GE cites, however, simply reiterate *Davis*'s stigma-plus principle. Thus, in *Doe v. United States Department of Justice*, we found that a government employee's liberty rights were implicated by a "discharge[] from government employment amidst stigmatizing allegations which have effectively foreclosed future employment opportunities with the government as well as private employers." 753 F.2d at 1110. Similarly, in *Reeve Aleutian Airways, Inc. v. United States*, we held that the government's suspension of an airline from a military airlift transportation program "based on stigmatizing charges" that the airline was unsafe did affect its liberty interest. 982 F.2d 594, 598 (D.C. Cir. 1993). Here, even assuming UAOs are stigmatizing, their consequences fall far short of completely foreclosing employment (*Doe*), or suspending a government contract (*Reeve Aleutian Airways*).

Finally, seeking to distinguish UAOs from government actions "like filing a complaint or issuing a policy report,"

Reply Br. 8 (quoting Appellees' Br. 19) (internal quotation marks omitted), GE insists that the issuance of a UAO triggers due process protections because it follows a fact-finding, adjudicatory proceeding. In support, the company cites two cases, *Jenkins v. McKeithen*, 395 U.S. 411 (1969) (plurality opinion), and *Hannah v. Larch*e, 363 U.S. 420 (1960). GE, however, failed to make this argument or discuss these cases until its reply brief, thus depriving EPA of an opportunity to respond. "To prevent this sort of sandbagging . . . , we have generally held that issues not raised until the reply brief are waived." *Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996) (citations omitted). We do so here as well.

That said, given the extent to which GE emphasized this argument both in its reply brief and at oral argument, it is worth pointing out that *Hannah* and *Jenkins* are not nearly as broad as the company claims. In *Hannah*, the Supreme Court upheld the Civil Rights Commission's rules of procedure, finding that the Commission's refusal to identify those who submitted complaints or to allow for cross-examination of witnesses did not violate the Due Process Clause. The Court relied on the fact that the Commission functioned as an investigative entity:

> It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's legal rights.

*Hannah*, 363 U.S. at 441. Nine years later, in *Jenkins*, the Supreme Court reached the opposite result with respect to the constitutionality of a statute that created the Louisiana Labor-Management Commission of Inquiry, a body whose members—appointed by the Governor and empowered to act only upon his referral—investigated possible criminal violations in the field of labor-management relations. The Commission was "required to determine, in public findings, whether there [was] probable cause to believe violations of the criminal laws ha[d] occurred," *Jenkins*, 395 U.S. at 416, and the plaintiff "alleged that [its] very purpose . . . [was] to find persons guilty of violating criminal laws without trial or procedural safeguards" such as the right to present evidence or to confront witnesses, *id.* at 424. Although noting that "the structure and powers of the Commission [at issue in *Jenkins*] [were] similar to those of the Civil Rights Commission" upheld in *Hannah*, *id*. at 425, the *Jenkins* plurality found that the Louisiana body "exercise[d] a function very much akin to making an official adjudication of criminal culpability," i.e., "find[ing] named individuals guilty of violating the criminal laws . . . and . . . brand[ing] them as criminals in public," *id*. at 427–28. As a result, the Court concluded, "the minimal requirements" of due process applied. *Id*. at 428.

GE argues that *Hannah* and *Jenkins*, taken together, establish that "where government action moves from investigatory to adjudicatory, the government must provide pre-deprivation hearings." Reply Br. 12. To be sure, some of *Jenkins*'s language, considered in isolation, might suggest such a rule. But we think the better reading is that in *Jenkins* the Court was addressing only adjudications of criminal culpability. In distinguishing *Hannah*, the Court relied heavily on the fact that the Louisiana Commission was "concerned only with . . . find[ing] named individuals guilty of violating the criminal laws . . . and . . . brand[ing] them as

criminals in public." *Jenkins*, 395 U.S. at 427–28. Indeed, in a discussion consuming only a single page of the U.S. Reports, the Court mentioned no fewer than six times that the Commission was charged with accusing individuals of criminal conduct. *Id.* The Court emphasized the same point in *Davis* when distinguishing *Jenkins*. Although the *Davis* majority and dissent disagreed as to whether *Davis*'s holding contradicted *Jenkins*, they found common ground in characterizing *Jenkins* as a case involving adjudications of criminal liability. The majority described the Louisiana Commission as "an agency whose sole or predominant function, without serving any other public interest, is to expose and publicize the names of persons it finds guilty of wrongdoing." *Davis*, 424 U.S. at 706 n.4 (quoting *Jenkins*, 395 U.S. at 438 (Harlan, J., dissenting)) (internal quotation marks omitted). Similarly, the dissent summarized *Jenkins* as holding that "the official characterization of an individual as a criminal affects a constitutional 'liberty' interest." 424 U.S. at 727 (Brennan, J., dissenting). Moreover, in the forty years since the Court decided *Jenkins*, it has never cited the case for the broader proposition advocated by GE, i.e., that the Due Process Clause is implicated whenever the government uses an adjudicatory process to find facts with respect to a particular individual or corporation. *Cf. Donaldson v. United States*, 400 U.S. 517, 540 (1971) (Douglas, J., concurring) (*Jenkins* "held that the commission exercised an accusatory function and was empowered to brand people as criminals. Therefore, due process required" certain procedural protections) (citation omitted). Given this, and given *Jenkins*'s repeated emphasis on criminal culpability, the decision has no applicability to CERCLA's UAO procedures, which are not only entirely civil, but fall far short of transforming EPA into a body "concerned only with" labeling PRPs as polluters. *Jenkins*, 395 U.S. at 427.

**III.**

GE contends that even if CERCLA's UAO provisions are facially constitutional, EPA administers the statute in a way that denies PRPs due process. Before addressing the merits of this "pattern and practice claim," however, we must consider EPA's argument that the district court lacked jurisdiction to entertain it.

*Jurisdiction*

EPA's jurisdictional argument rests on CERCLA section 113(h), which provides that "[n]o Federal court shall have jurisdiction . . . to review . . . any [unilateral administrative] order," until either cleanup work is complete or EPA brings an enforcement action. 42 U.S.C. § 9613(h). According to EPA, "GE's . . . 'pattern and practice' claim[] necessarily forced the district court to 'review' individual UAOs in violation of CERCLA section 113(h)." Appellees' Br. 40–41. GE responds that because it seeks no relief as to any particular UAO, its pattern and practice claim falls outside section 113(h)'s jurisdictional bar. What's more, GE argues, this court already held in *GE II* that the district court had jurisdiction over its pattern and practice claim.

We disagree with GE's reading of *GE II*. For one thing, in *GE II* we repeatedly referred to the company's challenge as a "facial" attack. *See GE II*, 360 F.3d at 189, 190, 191, 192. Indeed, we said only that "[w]e hold that the plain text of § 113(h) does not bar GE's *facial* constitutional challenge to CERCLA." *Id.* at 189 (emphasis added). In its *GE II* briefs, moreover, the company never even hinted that it meant to bring a pattern and practice challenge to EPA's administration of the statute. For example, in its opening brief GE repeatedly characterized its claim as facial, emphasizing that "*nothing* about the resolution of the merits of GE's

constitutional claim would change *in the slightest* even if EPA had *never* taken a single § 104 [removal or remedial] action or issued a single § 106(a) [unilateral administrative] order anywhere in the United States." Brief of Appellant at 20, *GE II* (No. 03–5118). It is true, as GE points out, that in *GE II* we relied on *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), in which the Supreme Court allowed a pattern and practice due process challenge to the way in which the Immigration and Naturalization Service was enforcing the immigration laws. But we cited *McNary* only to support our narrow reading of section 113(h)'s text, i.e., that the provision presents no bar to a facial challenge. *See GE II*, 360 F.3d at 192–93; *see also City of Rialto*, 581 F.3d at 880 (characterizing *GE II* as holding only that "a facial challenge was not barred").

Although we thus read *GE II* as holding only that the district court had jurisdiction over GE's facial challenge, we nonetheless agree with GE that the district court had jurisdiction to entertain its pattern and practice claim as well. Section 113(h) is quite clear: it only prohibits district courts from reviewing UAOs before enforcement or reimbursement proceedings have been initiated. Nothing in the provision bars a pattern and practice challenge that seeks no relief with respect to any particular UAO. To be sure, as EPA emphasizes, the district court did calculate a UAO error rate. But significantly for the section 113(h) issue before us, GE sought no relief with respect to individual UAOs, nor did the district court grant any.

This case is therefore controlled by *McNary*. There the Supreme Court concluded that the plain language of the immigration statute—which barred review "of a determination respecting an application" for special agricultural worker (SAW) status, 8 U.S.C. § 1160(e)(1)—

referred only to judicial review of "a single act rather than . . . a practice or procedure employed in making decisions," 498 U.S. at 492. Thus, although the statute prohibited courts from reviewing denials of individual applications for SAW status, district courts could nonetheless consider "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id*. The same principle applies to CERCLA section 113(h).

EPA argues that *McNary*'s outcome was dictated by a consideration not present here. In *McNary*, the Supreme Court pointed out that because the statute provided for review of SAW determinations only in deportation proceedings and only on a limited record, barring pattern and practice challenges would result in "a total denial of judicial review of [plaintiffs'] . . . constitutional and statutory claims." 498 U.S. at 497. According to EPA, *McNary* therefore requires that plaintiffs like GE who seek to bring pattern and practice challenges first show that the statute provides no meaningful judicial review for their claims. Because GE could pursue its due process claims in an enforcement or reimbursement proceeding, EPA argues, the district court lacked jurisdiction over the company's pattern and practice challenge.

Properly read, however, *McNary*'s conclusion that the immigration statute's jurisdiction-stripping provision presented no bar to a pattern and practice suit did not depend on the unavailability of alternative means of judicial review. Instead, it rested entirely on the Court's analysis of the jurisdictional provision's text: "Given Congress' choice of statutory language, we conclude that challenges to the procedures used by INS do not fall within the scope of [the jurisdictional bar]. Rather, we hold that [that provision] applies only to review of denials of individual SAW applications." *Id*. at 494. Not until the next section of its

opinion, in which it distinguished *Heckler v. Ringer*, 466 U.S. 602 (1984), did the Court address the availability of alternative routes of judicial review. In *Ringer*, four plaintiffs seeking Medicare reimbursement challenged a policy adopted by the Secretary of Health and Human Services pursuant to the Medicare statute, but in doing so they also sought to establish a right to reimbursement in their particular cases. The Court concluded that because the plaintiffs' claims were "at bottom, . . . claim[s] that they should be paid" for their particular procedures—which, under the statute, required administrative exhaustion—the district court had no jurisdiction to review them outside the administrative scheme. *Id*. at 614; *see id.* at 620. In so holding, the Court emphasized that plaintiffs' claims were neither separate from nor collateral to their individual Medicare determinations: the relief they sought "to redress their supposed 'procedural' objections" included "a 'substantive' declaration . . . that the expenses of [their surgeries were] reimbursable under the Medicare Act." *Id*. at 614. Distinguishing *Ringer* in *McNary*, the Court pointed out that the *McNary* plaintiffs sought no ruling on their individual determinations, and that "[u]nlike the situation in [*Ringer*]," a ruling in their favor would not "have the effect of establishing their entitlement to SAW status" outside the exclusive statutory regime. *McNary*, 498 U.S. at 495. Likewise, because a ruling in GE's favor would invalidate not a single UAO, section 113(h) presents no bar to the company's pattern and practice claim.

Although occasionally speaking in broad terms, our cases interpreting *McNary* hew to this distinction between collateral and particularized claims. For example, in *Daniels v. Union Pacific Railroad Co.*, 530 F.3d 936, 943–44 (D.C. Cir. 2008), we held that *McNary* did not give the district court jurisdiction over a due process challenge to railroad employees' demotions, i.e., individual challenges to particular

agency actions that were otherwise reviewable exclusively in the court of appeals. True, we stated that "the availability of effective judicial review is the touchstone of the *McNary* exception," *id*. at 943, but we said that only in concluding that the constitutional nature of plaintiffs' claims was insufficient, standing alone, to avoid the statutory bar on district court review of precisely the type of individualized claims plaintiffs had brought. Indeed, the plaintiffs' claims were akin to *Ringer* not *McNary*: among other things, they sought "reinstate[ment] . . . with full back-pay and benefits," *id*. at 942 n.11 (internal quotation marks omitted), relief in no way collateral to their substantive claims. Similarly, in *John Doe, Inc. v. DEA*, 484 F.3d 561 (D.C. Cir. 2007), we rejected a drug manufacturer's argument that *McNary* allowed the district court to review the denial of a permit otherwise reviewable only in the court of appeals. Although we did say that "the holding in *McNary* cannot be divorced from the Court's obvious concern that, absent district court review of the plaintiffs' claims, meaningful judicial review would have been entirely foreclosed," *id*. at 569, we made that observation in the context of a *Ringer*-like challenge—the drug manufacturer sought review of a particular order denying his permit application, a claim the statute required to be heard in the court of appeals. *See id.* at 564. In fact, *Doe* made no claims at all relating to DEA "patterns" or "practices." *See id*. at 570–73; *see also Fornaro v. James*, 416 F.3d 63, 68 (D.C. Cir. 2005) (finding that *McNary* did not support district court jurisdiction outside of administrative review process where plaintiffs sought a ruling that would require the payment of benefits in particular cases); *City of Rialto*, 581 F.3d at 877 (finding that district court lacked jurisdiction over claim that "[l]ike the claims in *Ringer* . . . [was] nothing more than a request for direct review of the validity" of a UAO). Accordingly, our cases interpreting *McNary* only bar claimants from circumventing statutory provisions that give

appellate courts jurisdiction to hear their individual challenges. Those cases leave undisturbed *McNary*'s holding that claims falling outside the text of a jurisdiction-channeling provision—like GE's pattern and practice challenge—may proceed in the district court.

Finally, EPA contends that even if section 113(h) permits GE's pattern and practice claim, GE lacks standing to bring it. *See Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 56 (1993) (noting that if a statute with a jurisdiction-delaying provision allows review of pattern and practice claims, those "claims still must satisfy the jurisdictional and justiciability requirements that apply in the absence of a specific congressional directive"). Constitutional standing is satisfied if a plaintiff demonstrates "the now-familiar elements of injury in fact, causation, and redressability." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). GE easily satisfies these requirements.

GE claims that EPA's allegedly unconstitutional practices and procedures repeatedly injure the company. For its part, "EPA does not dispute . . . that [it] has issued 68 UAOs to GE," *GE IV*, 595 F. Supp. 2d at 17, nor does it challenge the company's allegations that it has received additional UAOs "during the pendency of this case," and that it "is currently participating in response actions at 79 active CERCLA sites at any of which it may be issued UAOs" in the future, Reply Br. 22. Thus, GE has a personal stake in the outcome of this litigation, and unlike some of the plaintiffs in the cases EPA cites, the company alleges past injury and threatened future harm without relying on the issuance of UAOs to third parties. *Cf. City of Rialto*, 581 F.3d at 877 (finding that plaintiff lacked prudential standing to raise claims of third parties). Finally, GE's injuries, if proven, are

clearly attributable to EPA's administration of CERCLA and redressible by a declaratory judgment finding such practices unconstitutional.

*Pattern and Practice Challenge*

Having concluded that the district court had jurisdiction to consider GE's pattern and practice claim, we can quickly dispose of its merits. Although GE's briefs are less than clear, we understand the company to be arguing that the way in which EPA implements CERCLA's UAO provisions increases the frequency of UAOs and decreases their accuracy, thus tipping the *Matthews v. Eldridge* balance toward a finding that the process is constitutionally defective. For example, GE points to EPA's "enforcement first" policy, by which the agency issues UAOs whenever settlement negotiations fail, as well as to the agency's delegation of authority to subordinate regional employees who allegedly issue UAOs in time to comply with internal agency reporting deadlines. Appellant's Br. 45–46. GE argues that by encouraging EPA to issue UAOs more frequently, and by increasing the risk that those UAOs will be erroneous, these and other policies targeted in the company's briefs make it more likely that PRPs will suffer pre-hearing "deprivations" in the form of damage to their stock price, brand value, and credit rating. As GE's counsel conceded at oral argument, however, if such harms are insufficient to trigger due process protection, then this argument must fail. *See* Oral Arg. Tr. 21–23. Thus, because we have held that these consequential effects do not qualify as constitutionally protected property interests, *see supra* at 15–19, we need not—indeed, we may not—apply *Matthews v. Eldridge* to determine what process is due. In other words, even if GE is correct that EPA's implementation of CERCLA results in more frequent and less accurate UAOs, the company has failed to identify any constitutionally protected property interest that could be

adversely affected by such errors. *See Roth*, 408 U.S. at 570–71 ("[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake.").

In a few sentences in its opening brief, GE also contends that even if CERCLA is not facially coercive, EPA administers the statute in a way that "intimidate[s] PRPs from exercising the purported option of electing not to comply with a UAO so as to test an order's validity, giving rise to an independent due process violation under *Ex Parte Young*." Appellant's Br. 49. To the extent GE makes this argument, it urges us to infer coercion from the fact that the vast majority of PRPs elect to comply with UAOs. *Id*. at 49–50. As GE's amicus puts it, "[t]he dearth of non-complying PRPs reflects the exceptional coerciveness of UAOs and strongly supports GE's argument that the regulatory scheme amounts to a violation of due process under *Ex Parte Young*." Chamber of Commerce Amicus Br. 20.

Rejecting this argument, the district court began by explaining, properly in our view, that the pattern and practice claim added little to GE's facial *Ex Parte Young* challenge: regardless of EPA's policies—for example, GE alleges that the agency coerces PRPs into compliance by threatening to seek multiple penalties for violations at a single UAO site—"a *judge* ultimately decides what, if any, penalty to impose." *GE IV*, 595 F. Supp. 2d at 18. As noted above, moreover, CERCLA's sufficient cause and willfulness defenses protect PRPs from unwarranted fines and damages. *See supra* at 11–12. As to GE's argument that the high incidence of UAO compliance evidences coercion, the district court found that "GE's own expert . . . demonstrate[d] that instances of noncompliance are sufficiently numerous to suggest that PRPs are not, in fact, forced to comply." *GE IV*, 595 F. Supp.

2d at 28–29 (GE's expert found that "of the 1,638 PRPs who have been issued UAOs most recently, there were 75 instances of noncompliance—a rate of 4.6 percent."). And for our part, we observe that in light of the extensive procedures CERCLA requires EPA to follow before issuing a UAO, including notice and comment, *supra* at 4–5, recipients may be complying in large numbers not because they feel coerced, but because they believe that UAOs are generally accurate and would withstand judicial review. In any event, given that GE squarely challenges neither the district court's factual findings, *see* Fed. R. Civ. P. 52(a)(6), nor its legal conclusions, we have no basis for second-guessing the district court's resolution of this issue.

## IV.

We fully understand, as GE argues, that the financial consequences of UAOs can be substantial. We also understand that other administrative enforcement schemes that address matters of public health and safety may provide greater process than does CERCLA. *See* Appellant's Br. 40–41; Chamber of Commerce Amicus Br. 25–30; *but see* NRDC Amicus Br. 30–33 (arguing that "[n]umerous environmental statutes other than CERCLA establish regimes in which an agency orders an entity to comply with a statute without prior . . . trial-type hearings"). Such concerns, however, do not implicate the constitutionality of CERCLA or of the policies and practices by which EPA implements it. Even if "[i]n the best of all worlds," greater process "might be desirable, . . . Congress . . . struck a different balance" in designing CERCLA's UAO regime. *Ringer*, 466 U.S. at 627. Because our judicial task is limited to determining whether CERCLA's UAO provisions violate the Fifth Amendment

either on their face or as administered by EPA, we affirm the decisions of the district court.

*So ordered.*