# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 9, 2010          Decided December 3, 2010

No. 09-1310

KRISTIN BROOKS HOPE CENTER,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS

———

On Petition for Review of an Order
of the Federal Communications Commission

———

*Barbara A. Miller* argued the cause of the petitioner. With her on the briefs were *Danny E. Adams* and *Ira T. Kasdan.*

*Pamela L. Smith*, Counsel, Federal Communications Commission, argued the cause for respondent. With her on the brief were *Catherine O'Sullivan* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, *Austin C. Schlick*, General Counsel, Federal Communications Commission, *Jacob M. Lewis*, Acting Deputy General Counsel, and *Daniel M. Armstrong*, Associate General Counsel. *Robert B. Nicholson*, Attorney, U.S. Department of Justice, and *Richard K. Welch*, Deputy Associate General Counsel, Federal Communications Commission, entered appearances.

Before: HENDERSON, *Circuit Judge,* WILLIAMS and RANDOLPH, *Senior Circuit Judges.*

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:  The Kristin Brooks Hope Center (the "Center") is a nonprofit organization that has operated suicide prevention hotlines since 1998. With the Center facing financial difficulties that risked causing the hotlines' disconnection, the federal Substance Abuse and Mental Health Services Administration ("SAMHSA") asked the Federal Communications Commission in December 2006 to reassign five of the Center's toll-free hotline numbers to SAMHSA. The FCC granted the request in part, temporarily reassigning three numbers in January 2007. That November, SAMHSA requested that the FCC make the reassignment of numbers permanent. The Center protested, but the FCC granted SAMHSA's request. The Center now argues that the FCC's decision to permanently reassign the numbers was "arbitrary, capricious, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We agree.

\* \* \*

In 1998 H. Reese Butler founded the Center in the memory of his late wife, who had committed suicide while suffering from post-partum depression. The Center operates several toll-free suicide prevention hotlines that route callers to a trained crisis counselor in the caller's local area. The numbers at issue here, 1-888-SUICIDE, 1-800-SUICIDE, and 1-877-SUICIDA, were among the Center's earliest hotline numbers. Over time the Center has expanded to include many other numbers, including some targeted at particular at-risk

groups, such as veterans, new mothers, and young people.[1] The Center's goal is to operate and publicize these hotlines; it does not run the counseling centers or train the counselors.

In 2006, the Center found itself in serious financial trouble. For some years, it had received funds as a subcontractor to the American Association of Suicidology, which in turn was funded by a government grant. The Center's funding dried up when the Association's grant expired in 2005. The Center eventually fell behind in payments to its then current phone service provider and was in default of payment to its former provider. (It appears to have had trouble only with 1-800-SUICIDE, evidently because usage on the other hotlines was much lighter.) In August 2006, Secretary of Health and Human Services Michael O. Leavitt wrote to the Chairman of the FCC to request that the FCC reassign 1-800-SUICIDE from the Center to SAMHSA, a subagency of HHS. Letter of Aug. 25, 2006. SAMHSA supports suicide prevention efforts, including operation of the National Suicide Prevention Lifeline (1-800-273-TALK), a hotline, not unlike those of the Center, connecting callers with crisis counseling centers. Because SAMHSA could operate the Center's numbers in parallel to its own, Secretary Leavitt argued that transfer would prevent disruption to the hotlines and the loss of life that might occur if the Center's service provider disconnected 1-800-SUICIDE.

In response, the Wireline Competition Bureau within the FCC granted a temporary reassignment of the three suicide prevention hotlines in January 2007. In the Matter of Toll

---

[1] The Center's other numbers include 1-800-SUICIDA, 1-800-442-HOPE, 1-877-VET2VET, 1-800-772-9498, 1-800-827-7571, 1-866-771-1276, 1-866-YOUTHLINE, 1-877-YOUTHLINE, 1-888-861-8460, 1-877-495-0009, 1-800-GRADHLP, 1-877-GRADHLP, and 1-800-PPDMOMS.

Free Service Access Codes, 22 FCC Rcd 651 (2007). Under 47 U.S.C. § 251(e)(1), the FCC has plenary authority "over those portions of the North American Numbering Plan that pertain to the United States." The Commission's implementation of this authority includes its adoption of a rule stating that "[t]oll free numbers shall be made available on a first-come, first-served basis unless otherwise directed by the Commission." 47 C.F.R. § 52.111. Here the Bureau directed "otherwise." Given the ongoing dispute between the parties and the potentially tragic consequences of disruption, it found that "a deviation from the first-come, first-served rule is warranted in this extraordinary, emergency situation," and it ordered the requested transfer. 22 FCC Rcd 651 at ¶¶ 8, 11.

In November 2007 (and in additional letters over the next two years), SAMHSA requested that the FCC permanently reassign the suicide prevention hotlines, arguing that the hotlines are a crucial public health resource and that reversion to the Center risked another public safety emergency, given the Center's financial instability. The Center responded, repeatedly, that it had resolved its outstanding debts, engaged in a fundraising campaign resulting in $240,000 in cash reserves, and negotiated a new agreement with a phone service provider. It also argued that there was no current emergency warranting permanent reassignment. In October 2009, the FCC granted SAMHSA's request, permanently reassigning the suicide prevention hotlines. U.S. Dept. of Health and Human Services Substance Abuse and Mental Health Services Administration Petition for Permanent Reassignment of Three Toll Free Suicide Prevention Hotline Numbers, Toll Free Service Codes, 24 FCC Rcd 13022 (2009) (the "FCC Decision"). The Center appealed, arguing that the FCC's decision was arbitrary and capricious under 5 U.S.C. § 706(2)(A) and was an unconstitutional taking under the Fifth Amendment to the Constitution.

5

\* \* \*

When evaluating agency action that is alleged to be arbitrary or capricious under 5 U.S.C. § 706(2)(A), our primary task is to ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)). The agency's explanation cannot "run[] counter to the evidence," *id.*, and it must "enable us to conclude that the [agency's action] was the product of reasoned decisionmaking." *Id.* at 52.

By way of background, we note that 47 C.F.R. § 52.111 is one of several FCC provisions governing the allocation of toll-free numbers. Absent the Commission's temporary reassignment, it appears that the hotlines would have gone into either "disconnect" or "suspend" status, and would either have returned to the Center's use or, after four or eight months, respectively, would have lapsed back into the general pool for reassignment. See *id*. § 52.103. Because of the Center's financial problems, of course, service for persons contemplating suicide might have been severely limited. (In "disconnect" status there would likely have been "an exchange carrier intercept recording." See *id*. § 52.103(a)(2). According to the phone service provider's lawyers, it would on termination of service have "post[ed] an outgoing message directing callers to call 1-800-273-TALK [the National Suicide Prevention Lifeline] for assistance." Joint Appendix 213.)

Explaining its permanent reassignment decision, the FCC said that its "overriding priority [was] the long-term stability of the Hotlines and, in turn, avoidance of another potential

public safety crisis in the future." FCC Decision, 24 FCC Rcd at 13030 ¶14. To that end, it would "choose the entity [it] believe[s] is more capable of operating the Hotlines long-term." *Id.* It argued that SAMHSA was superior to the Center in both financial stability and quality of services. See *id.* at 13033 ¶21 (finding that SAMHSA will be the best provider of "financially stable, top-quality service for the long-term"). We think the FCC failed to provide a reasonable explanation on both counts.

In concluding that SAMHSA "best ensures the long-term financial viability of the Hotlines," *id.*, the FCC relied on unsupported assertions regarding the Center's financial stability. The Center reported that it had accumulated $240,000 in cash reserves, which could cover two years of operations, and that it had reached over $1 million in existing and pledged assets through an expanded fundraising campaign. Letter from Danny E. Adams, Counsel to the Center, to Michael J. Copps, Acting Chairman, FCC, June 15, 2009, at 4. Even though the FCC assumed the Center had enough funds for two years of service, it was "not convinced" that this was enough "to prevent future disruptions." FCC Decision, 24 FCC Rcd at 13030 ¶15. Looking beyond two years and noting the rise in volume of calls, it worried that "we could be faced with a similar situation as occurred previously in which [the Center] was unable to pay its service provider for telecommunication services and the service provider threatened disconnection." *Id.* at 13030 ¶16.

The Commission's extrapolation from the Center's past financial difficulties was quite a leap. The history of those difficulties—which arose at least in part from its transition from government grants to private fundraising—seems to undermine a strong inference that recurrence was likely. But the FCC did not explore the circumstances under which the Center's financial troubles arose, and as a result did not

explain whether it believed those particular conditions were likely to recur or whether some other trouble might befall the Center. Fear may have supplanted reason.

The Commission also set the bar for the Center curiously high. Even with its improved fundraising efforts, it said, the Center could not "guarantee" funding for longer than two years, whereas SAMHSA "can guarantee it indefinitely." *Id.* at 13031 ¶17. Although the FCC's attention to long-term stability was driven by the past instability of the hotlines, the Commission did not explain or even hint at what duration of time would be sufficient. Surely "indefinitely" cannot be the standard. No private actor could ever satisfy that test, and the FCC's principle cannot be that the government always wins. For that matter, government agencies like SAMHSA can hardly "guarantee" funding "indefinitely"; their funds depend entirely on the appropriations of Congress.

Although the FCC faced a challenging line-drawing problem, its justifications for favoring SAMHSA over the Center were inadequately explained. It's a rare organization whose treasury is so ample that it is sure of being able to operate decades into the future. For-profit organizations, nonprofit organizations, and governments alike replenish their treasuries at regular intervals—through revenues from sales, fundraising campaigns, or taxes. (Like death, taxes may be certain, but their yield and disposition are not.) A nonprofit like the Center surely could have two years of funding available at present and in the course of those two years, raise more money for later years of operations. Yet the FCC seems not to have considered this possibility seriously, and it certainly provided no explanation for why the risks of dependence on private fundraising would be so detrimental to public safety as to justify insisting on guarantees for more than two years. It simply assumed that two years of funding was not enough. The Center's financial strategy could

conceivably be too risky to maintain the hotlines, but the FCC has not explained why.

The FCC itself noted that SAMHSA's budget period for the hotlines was established by a five-year grant awarded in 2007. See *id.* at 13033 ¶22 n.87. As a result, SAMHSA's dedicated funding stream ends in 2012—only a little more than two years from the time of the FCC's decision. Yet the FCC did not explain why the Center's two years of funding was not acceptable, while SAMHSA's barely longer term was.

In its evaluation of the Center's and SAMHSA's quality of service, the Commission's reasoning is also obscure. First, it appears to have given considerable weight to SAMHSA's provision of "training, information, stipends, and additional research funding to assist the crisis centers." *Id.* at 13031 ¶17. But it is unclear how these relate to the FCC's stated objective of assuring the "long-term stability" of the *hotlines* themselves. *Id.* at 13030 ¶14. So far as appears, SAMHSA could readily provide these services to crisis centers if the Center ran the hotlines.

Similarly, the FCC cited SAMHSA's partnership with the Department of Veterans Affairs, which allows callers to the National Suicide Prevention Lifeline (1-800-273-TALK)—and since the temporary reassignment, callers to 1-800-SUICIDE—to press 1 and connect directly with VA suicide prevention services. See FCC Decision, 24 FCC Rcd at 13031-13032 ¶18; Letter from Eric K. Shinseki, Secretary, VA, and Kathleen Sebelius, Secretary, HHS, to Michael J. Copps, Acting Chairman, FCC, May 13, 2009. Again this seems easily divisible from running the hotlines, especially as the FCC itself noted that the Center was "willing and eager to work with the VA" to provide that service. FCC Decision, 24 FCC Rcd at 13028 ¶10 n.43.

The FCC, to be sure, made some mention of quality differentials that appear integral to hotline operation. It cited comments from crisis center managers that SAMHSA's operations were well-managed. *Id.* at 13032 ¶19. But to the extent that these comments were comparative at all, many of them focused on the funding troubles the Center had had prior to the temporary reassignment. See, e.g., Letter from Crisis Center Directors to FCC, WC Docket 07-271, filed May 11, 2009; Letter from Dale W. Emme and R. Darlene Emme, Yellow Ribbon, to Michael J. Copps, Acting Chairman, FCC, June 8, 2009. On the other side of the ledger, the FCC failed to evaluate evidence offered by the Center. The latter had explained that it had entered an agreement with the Micktel Corporation to provide services including routing, reporting, real-time call tracing, and access to center management tools, Letter from Danny E. Adams, Counsel, the Center, to Michael J. Copps, Acting Chairman, FCC, June 15, 2009, at 4, but the FCC made no effort to compare the quality of Micktel's offerings with those available to SAMHSA.

\* \* \*

In light of its failure to provide a reasonable explanation that connects the "facts found" and the "choice made," *Burlington Truck Lines,* 371 U.S. at 168, the FCC's decision is arbitrary and capricious under 5 U.S.C. § 706(2)(A). The Center also argues that the FCC's action violates the takings clause of the Fifth Amendment to the Constitution, but given our finding that the Commission's decision is arbitrary and capricious, we need not address the constitutional question. We therefore vacate the reassignment of the hotlines and remand for proceedings consistent with this opinion.

*So ordered.*