# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 14, 2011        Decided June 10, 2011

No. 10-1062

CABLEVISION SYSTEMS CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION, ET
AL.,
INTERVENORS

Consolidated with 10-1088

On Petitions for Review of an Order
of the Federal Communications Commission

*Henk J. Brands* argued the cause for petitioners. With him on the briefs were *Howard J. Symons* and *Jeffrey A. Lamken*.

*Neal M. Goldberg*, *Michael S. Schooler*, *Diane B. Burstein*, *Samuel L. Feder*, and *Matthew E. Price* were on the

brief for intervenor National Cable & Telecommunications Association in support of petitioner. *Robert G. Kidwell* entered an appearance.

*C. Grey Pash Jr.*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Catherine G. O'Sullivan* and *Nancy C. Garrison*, Attorneys, U.S. Department of Justice, *Austin C. Schlick*, General Counsel, Federal Communications Commission, *Peter Karanjia*, Deputy General Counsel, and *Daniel M. Armstrong III*, Associate General Counsel. *Richard K. Welch*, Deputy Associate General Counsel, and *Nandan M. Joshi*, Counsel, entered appearances.

*Jonathan E. Nuechterlein* argued the cause for intervenors AT&T, Inc., et al. in support of respondents. With him on the brief were *Heather M. Zachary*, *Christopher M. Heimann*, *Gary L. Phillips*, *Scott H. Angstreich*, *Jeffrey M. Harris*, *Michael E. Glover*, *Edward Shakin*, *William H. Johnson*, and *Christopher J. Wright*.

Before: ROGERS, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:   Under section 628 of the Communications Act, the Federal Communications Commission has long imposed program access requirements on vertically integrated cable companies in order to limit their ability to withhold satellite programming from competitors in the video distribution market. Recognizing that existing regulations governing satellite video distribution allowed vertically integrated cable companies to withhold *terrestrially* delivered programming, a small but competitively significant niche whose importance has increased with improved

technology, the Commission issued an order adopting rules to close the so-called terrestrial loophole. Challenging that order, petitioners contend (among other things) that the Commission lacks statutory authority to regulate the withholding of terrestrial programming. But given section 628's broad language and purpose—promoting competition by restricting vertically integrated cable companies from denying their competitors access to popular programming networks—we see nothing in the statute that unambiguously precludes the Commission from extending its program access rules to terrestrially delivered programming. Nor do we see any merit in petitioners' contention that the Commission's rules violate the First Amendment or in their various Administrative Procedure Act challenges, save one: that the Commission acted arbitrarily and capriciously by deciding to treat certain conduct involving terrestrial programming withholding as categorically "unfair" for purposes of section 628.

## I.

To provide context for the challenged order, we begin with a brief overview of the video programming industry and the relevant terminology. The industry includes two essential players: video programmers and video programming distributors. Distributors, who provide video programming directly to consumers, are called "multichannel video programming distributors" (MVPDs). *See* 47 U.S.C. § 522(13). This general category includes "cable operators" like Cablevision, Comcast, and TimeWarner who deliver video programming by cable, *id.* § 522(5)–(7), direct broadcast satellite (DBS) companies like DirecTV and Dish Network who transmit programming via direct-to-home satellites, and wireline companies like AT&T and Verizon who transmit programming through fiber optics. *See In re Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming: Thirteenth Annual*

*Report*, 24 FCC Rcd. 542, 544–48 ¶¶ 4–13 (2009) (providing an overview of the MVPD market). Video programmers, also referred to as video programming vendors, are television networks like ESPN, TNT, and CNN who sell or license programming to MVPDs. Particularly relevant to this case, video programming, and by extension the programmers who sell it, is classified based on the technology used to transmit it to MVPDs, not on the technology MVPDs then use to retransmit it to customers. Satellite programming refers to programming transmitted to MVPDs via satellite for retransmission to customers. *See* 47 U.S.C. § 548(i)(1), (3) (providing definitions for both "satellite cable programming" and "satellite broadcast programming"). By contrast, terrestrial programming refers to programming delivered to MVPDs over land-based networks, such as fiber optics. *See* 47 C.F.R. § 76.1000(*l*).

As we recently explained, "[f]rom the 1940s when the first cable television systems were built until the 1990s, the cable industry dominated [the MVPD retail] market," with cable operators often enjoying local monopolies. *Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1308 (D.C. Cir. 2010). While the market for cable operators flourished, the demand for new cable programming to supplement traditional broadcast programming also increased. "These two halves of the cable industry often had—and still have—overlapping ownership, with cable operators having ownership interests in cable programmers, and vice versa." *Id.* Recognizing that the combination of horizontal concentration and vertical integration in the video market created the "potential for certain anticompetitive conduct" because "[v]ertically integrated cable operators" could "deny alternative [MVPDs] access to cable programming services" they needed to compete for customers, the Commission presented a report to Congress in 1990 recommending (among other things) that it

restrict vertically integrated cable programmers from refusing to share their programming with other MVPDs. *See In re Competition, Rate Deregulation & the Comm'n's Policies Relating to the Provision of Cable Television Serv.,* 5 FCC Rcd. 4962, 4971–77 ¶¶ 13–14 (1990).

Two years later, Congress enacted the Cable Television Consumer Protection and Competition Act of 1992 ("Cable Act"), Pub. L. No. 102-385, 106 Stat. 1460, which amended the Communications Act of 1934. Finding that "[t]he cable industry had become vertically integrated" and that cable-affiliated programmers had "the incentive and ability to favor their affiliated cable operators over nonaffiliated cable operators and programming distributors using other technologies," *id.* § 2(a)(5), Congress adopted section 628 to "increas[e] competition and diversity in the multichannel video programming market," 47 U.S.C. § 548(a). Section 628(b) makes it

> unlawful for a cable operator, a satellite cable programming vendor in which a cable operator has an attributable interest, or a satellite broadcast programming vendor to engage in unfair methods of competition or unfair or deceptive acts or practices, the purpose or effect of which is to hinder significantly or to prevent any multichannel video programming distributor from providing satellite cable programming or satellite broadcast programming to subscribers or consumers.

*Id.* § 548(b). To implement that prohibition, section 628(c)(1) directs the Commission to issue regulations specifying particular unlawful conduct, *id.* § 548(c)(1), and subsection (c)(2) establishes "[m]inimum contents" for those regulations. Specifically, subsection (c)(2) directs the Commission to

prohibit three different kinds of practices. First, it must prevent cable operators from "improperly influencing" actions by affiliated satellite cable programming vendors and satellite broadcasting vendors concerning the sale of satellite programming to unaffiliated MVPDs. *Id.* § 548(c)(2)(A). Second, the Commission must prohibit vertically integrated satellite cable programming vendors and satellite broadcasting vendors from discriminating between MVPDs in the sale of their satellite programming (subject to limited exceptions). *Id.* § 548(c)(2)(B). Third, the Commission must bar exclusive contracts for satellite programming between cable operators and vertically integrated satellite programmers. *Id.* § 548(c)(2)(C)–(D). With respect to areas unserved by cable at the time the Act was passed in October 1992, that prohibition is absolute. *Id.* § 548(c)(2)(C). But in areas served by cable prior to that date, the statute allows the Commission to exempt exclusive contracts that it determines, based on statutory criteria, are "in the public interest." *Id.* § 548(c)(2)(D), (c)(4). The prohibition on exclusive contracts in these areas was to sunset after ten years unless the Commission determined that the prohibition remained necessary to protect competition and diversity in video programming distribution. *Id.* § 548(c)(5).

In order to implement section 628(c)(2)'s program access provisions, the Commission issued regulations containing (among other things) a complaint procedure to address alleged violations. *See In re Implementation of Sections 12 & 19 of the Cable Television Consumer Prot. & Competition Act of 1992*, 8 FCC Rcd. 3359 (1993). In doing so, the Commission declined to identify additional specific "unfair" acts or practices beyond those listed in subsection (c)(2) that could violate subsection (b). It recognized, however, that subsection (b) remained "a clear repository of Commission jurisdiction to adopt additional rules or take additional actions" to "address[]

those types of conduct, primarily associated with horizontal and vertical concentration within the cable and satellite cable programming field, that inhibit the development of multichannel video distribution competition." *Id.* at 3373–74 ¶¶ 40–41. Since adopting these initial rules, the Commission has twice extended subsection (c)(2)(D)'s prohibition on exclusive contracts for satellite programming in previously served areas. *See Cablevision*, 597 F.3d at 1312–15 (denying petitions for review challenging the Commission's most recent extension in 2007).

Accordingly, since 1992, vertically integrated cable companies have been subject to regulations that prohibit exclusive dealing arrangements and other related anticompetitive practices for satellite programming. But because none of these restrictions applied to the withholding of *terrestrial* programming, vertically integrated cable operators have been free to enter into exclusivity deals with cable-affiliated programmers for terrestrial programming and thus to withhold such programming from competitor MVPDs. *See In re Review of the Comm'n's Program Access Rules & Examination of Program Tying Arrangements*, 25 FCC Rcd. 746, 766–67 ¶ 30 (2010) [hereinafter *2010 Order*] (citing examples of terrestrial programming withholding).

Although terrestrial programming accounts for only a minority of video programming and is generally limited to regional and local networks, improved technology has made "terrestrial distribution . . . more cost effective." *Id.* at 766 ¶ 30. As a result, its use is "likely to continue and possibly increase in the future." *Id.* Moreover, the importance of terrestrial programming to the video programming market exceeds its share of that market. A significant number of Regional Sports Networks (RSNs) are terrestrially delivered, and the Commission has long recognized that such

programming, given its "must have" and nonreplicable nature, could drive the MVPD market. *See In re Annual Assessment of the Status of Competition in Markets for the Delivery of Video Programming: Sixth Annual Report*, 15 FCC Rcd. 978, 986 ¶ 16 (2000) ("We recognize that the terrestrial distribution of programming, including in particular regional sports programming, could eventually have a substantial impact on the ability of alternative MVPDs to compete in the video marketplace.").

In 2010, following notice and comment, the Commission decided to close the "terrestrial loophole." *2010 Order*, 25 FCC Rcd. at 747 ¶ 1. Recognizing that section 628(c)(2) imposes specific prohibitions on satellite programming only and that the "focus of the statute is not on the ability of an MVPD to provide a particular terrestrially delivered programming network," *id.* at 758, 774 ¶¶ 20, 39, the Commission located its authority to close the terrestrial loophole in two places: subsection (b)'s broad prohibition and subsection (c)(1)'s delegation of authority to promulgate regulations implementing subsection (b). Although acknowledging that subsection (b) contains no express mandate to share terrestrial programming, the Commission explained that the provision does prohibit unfair acts "that have the purpose or effect of preventing or hindering significantly an MVPD from providing satellite . . . programming" to its customers. *Id.* at 751 ¶ 11 (citing 47 U.S.C. § 548(b)). And in some instances, according to the Commission, record evidence demonstrated that withholding terrestrial programming has just such an effect. Cable operators continue to "own programming for which there may be no good substitutes, and this 'must-have' programming is necessary for viable competition in the video distribution market." *Id.* at 770 ¶ 34. In support, the Commission pointed to a 2006 regression analysis finding that the withholding of

terrestrial RSNs substantially lowered the percentage of television households subscribing to DBS in two of three studied markets from what would have been expected without such withholding. *See id.* at 768 ¶ 32. Specifically, the study concluded that terrestrial programming withholding decreased a competitor MVPD's market share from 14.5% to 8.6% in Philadelphia and from 11.1% to 7.4% in San Diego, although it found no statistically significant effect in Charlotte. *See In re Applications for Consent to the Assignment and/or Transfer of Control of Licenses Adelphia Commc'ns*, 21 FCC Rcd. 8203, 8345–46 app. D ¶¶ 17–18 (2006).

The Commission acknowledged that when a cable-affiliated company withholds terrestrial programming, competitor MVPDs ordinarily remain able to deliver satellite programming to customers. But in some cases, the Commission determined, denying access to must-have terrestrial programming, like RSNs, could discourage alternative MVPDs "from entering new [geographic] markets or . . . limit [their] ability . . . to provide a competitive alternative to the incumbent cable operator." *2010 Order*, 25 FCC Rcd. at 774 ¶ 39. In other words, "the effect of denying an MVPD the ability to provide certain terrestrially delivered, cable-affiliated programming may be to *significantly hinder* the MVPD from providing video programming in general, including satellite . . . programming . . . , as well as terrestrially delivered programming." *Id.* (emphasis added). This significant hindrance could, in turn, adversely affect consumers by reducing competition, "allow[ing] cable operators to raise rates and to refrain from innovating." *Id.*

Having determined that it had statutory authority to close the terrestrial loophole, the Commission, through the challenged order, issued regulations authorizing the filing of complaints alleging that an MVPD or satellite programming

vendor violated section 628(b) by (1) engaging in unfair terrestrial programming withholding that (2) prevented or significantly impaired an MVPD from providing satellite programming to customers. In those regulations, the Commission identified the conduct it would consider "unfair" under section 628(b). Specifically, MVPDs could file complaints against cable operators and covered satellite programming vendors for actions that would violate section 628(c)(2) "but for the terrestrial loophole," i.e., conduct involving undue influence, discrimination, or exclusive agreements. *Id.* at 778–80 ¶¶ 48–49. Although the Commission found subsection (c)(2)-like conduct involving terrestrial programming to be categorically "unfair," it declined to ban such conduct outright. Instead, it required complainants to show that the unfair act in fact had "the purpose or effect of hindering significantly or preventing [them] from providing satellite . . . programming to subscribers or consumers." *Id.* at 780–81 ¶ 50. "For most terrestrially delivered, cable-affiliated programming" that is "readily replicable" such as local news or local community programming, the Commission indicated that "the record contain[ed] no evidence" that subsection (c)(2)-like conduct would generally have such a purpose or effect. *Id.* at 781 & n.200 ¶ 51. But "especially given predictions that programming will increasingly shift to terrestrial delivery," the Commission left open the possibility that complainants could satisfy their burden of proof in individual cases. *Id*. at 781 ¶ 51. As to RSN programming, however, the Commission found that its precedent and record evidence, such as the 2006 regression analysis discussed above, demonstrated that such programming is "very likely to be both non-replicable and highly valued by consumers." *Id.* at 782–83 ¶ 52. As a result, complainants could "invoke a rebuttable presumption that an unfair act involving a terrestrially delivered, cable-affiliated RSN has the purpose or effect set forth in [s]ection 628(b)."

*Id.* The Commission extended this rebuttable presumption to an RSN's high definition (HD) programming feed, relying on "substantial evidence regarding consumers' preference for HD programming." *Id.* at 784–85 ¶¶ 54–55.

In designating the entities it could hold liable, the Commission explained that section 628(b) required it to address the unfair acts of cable operators and covered satellite programming vendors "but not the unfair acts of other programmers delivering programming only by terrestrial means." *Id.* at 786 ¶ 57. Applying section 628(b), the Commission rejected the argument, made by several commenters, that satellite programming vendors could not possibly violate this provision because the distribution of terrestrial programming falls outside such vendors' statutorily defined activities. According to the Commission, this argument "read[] into the statute an additional condition that is not there" because "[n]othing in the statute excludes an otherwise covered entity from the reach of [s]ection 628(b)" when such an entity engages in unlawful activities. *Id.* at 779 n.192 ¶ 49. To address unfair conduct by cable-affiliated programmers who provide *only* terrestrially delivered programming, the Commission imposed vicarious liability on the cable operator or covered satellite programmer where the complainant "establish[ed] that the [terrestrial] programmer is wholly owned by, controlled by, or under common control with one or more of these entities." *Id.* at 786 ¶ 57. The Commission explained that vicarious liability was "necessary to give [s]ection 628(b) practical effect." *Id.* Otherwise, a cable-controlled terrestrial program supplier could circumvent the regulations by "insist[ing] that a competitive MVPD pay an exorbitant rate," thereby "achieving the same result as an exclusive contract." *Id.*

Cablevision Systems Corporation and Madison Square Garden L.P., respectively a cable operator and video programmer, own satellite and terrestrially delivered video programming services and have a common controlling shareholder. The two companies petition for review of the Commission's terrestrial programming order. Along with their supporting intervenor, the National Cable & Telecommunications Association (NCTA), petitioners raise three principal objections. First, they contend that the Commission exceeded its section 628 authority by extending its program access rules to terrestrially delivered programming. Second, they argue that the Commission's rules, which regulate speech activities of cable operators and video programmers, violate the First Amendment. Third, they argue that certain specific features of the rules run afoul of section 628, the Administrative Procedure Act (APA), and/or the First Amendment. We consider each argument in turn.

## II.

Starting with petitioners' statutory argument, we apply the familiar *Chevron* framework to the Commission's interpretation of its governing statute. *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842–43 (1984). We begin by asking "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has, we "give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. But if Congress has not unambiguously foreclosed the agency's construction of the statute, we defer to the agency provided its construction is reasonable. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

Petitioners face an uphill climb in arguing that the Commission's interpretation of section 628(b) fails under *Chevron* step one. In *National Cable & Telecommunications*

*Ass'n v. FCC* ("*NCTA*"), we described section 628(b)'s prohibition as "broad and sweeping," observing that its language bars unfair "practices 'the purpose *or effect* of which is to *hinder significantly* or to prevent *any* multichannel video programming distributor from providing satellite . . . programming . . . to subscribers or consumers.' " 567 F.3d 659, 664 (D.C. Cir. 2009) (quoting 47 U.S.C. § 548(b)). This broad language, we pointed out, "comports" with section 628's similarly expansive "express purpose of 'promot[ing] the public interest, convenience, and necessity by increasing competition and diversity in the multichannel video programming market.' " *Id.* (quoting 47 U.S.C. § 548(a)). "Mindful that statutes written in broad, sweeping language should be given broad, sweeping application," *id.* (internal quotation marks omitted), we rejected a challenge to a Commission order banning exclusivity agreements between cable operators and the owners of apartment buildings and other multiple dwelling units (the "MDU order"). We concluded that the Commission acted "well within the bounds of . . . section 628" because such exclusivity agreements have both the purpose and effect of preventing rival MVPDs from providing satellite programming to customers. *Id.* at 661, 663–64.

Notwithstanding *NCTA* and section 628's broad language, petitioners insist that the statute unambiguously precludes the Commission's terrestrial program access rules. First, highlighting section 628(c)(2)'s repeated references to *satellite* programming, they claim that Congress deliberately exempted terrestrial programming from the Commission's program access regime and that the Commission may not use its subsection (b) and (c)(1) general authority to disturb that choice. Second, petitioners maintain that the order conflicts with section 628(b)'s designation of the entities that can be held liable for violating the prohibition. As the Commission

acknowledged, section 628(b) applies to cable operators and to two types of satellite programming vendors, but *not* to purely terrestrial programmers. *2010 Order*, 25 FCC Rcd. at 786–87 ¶ 57. According to petitioners, "it is inconceivable that, if Congress intended to authorize the FCC to prohibit the withholding of terrestrial programming, it would have drafted" the statute in this way. Pet'rs' Br. 38. Finally, petitioners contend that the Commission's order violates section 628(b)'s requirement that prohibited unfair acts prevent or significantly hinder an MVPD "from *providing satellite* . . . programming to subscribers and consumers." 47 U.S.C. § 548(b) (emphasis added). Interpreting "to provide" to mean "to furnish" or "to make available," petitioners argue that when a vertically integrated cable company withholds terrestrial programming, it places no restrictions whatever on a rival MVPD's ability to make satellite programming available to willing customers.

Petitioners' first argument—that section 628(c)(2)'s limitations implicitly restrict the scope of section 628(b)'s general prohibition—fails for the same reason we rejected a similar argument in *NCTA*. "By its terms, section 628(c)[(2)] describes only the '[m]inimum contents of regulations. . . .' " *NCTA*, 567 F.3d at 664–65 (quoting 47 U.S.C. § 548(c)(2)). Indeed, "Congress's enumeration of specific, required regulations in subsection (c) actually suggests that Congress intended subsection (b)'s generic language to cover a broader field." *Id.* at 665. Petitioners' reliance on cases holding that agencies may not use their general rulemaking authority to override a more specific statutory directive is thus misplaced. *See, e.g.*, *Nat'l Mining Ass'n v. Dep't of Interior*, 105 F.3d 691, 693–94 (D.C. Cir. 1997) (holding that a general grant of rulemaking authority did not authorize the agency to supplement statutory conditions for when mining permits would be withheld); *Natural Res. Def. Council, Inc. v. Reilly*,

976 F.2d 36, 41 (D.C. Cir. 1992) (holding that the EPA could not use its general grant of rulemaking authority to stay regulations subject to statutory deadlines). Because section 628(c)(2) establishes a floor rather than a ceiling, the Commission's reliance on subsections (b) and (c)(1) to regulate conduct that subsection (c)(2) leaves unrestricted in no way contravenes congressional intent.

Petitioners acknowledge that given subsection (c)(2)'s "minimum contents" caption, the Commission necessarily has authority to issue rules that go beyond that subsection. This, they nonetheless insist, is "no answer" to their argument that subsection (c)(2) expresses a congressional decision to exempt terrestrial programming withholding from regulation. Pet'rs' Br. 37. Congress "carefully considered prohibiting cable operators from withholding terrestrial programming but conspicuously stopped short of doing so." *Id.* at 35. In support, petitioners point out that Congress adopted the House version of section 628(c)(2), which applied only to satellite programming, instead of the Senate version, which would have imposed fair dealing restrictions on cable-affiliated programmers without distinguishing between methods of programming transmission. *See* H.R. Rep. No. 102-862, at 91 (1992) (Conf. Rep.), *reprinted in* 1992 U.S.C.C.A.N. 1231, 1273. Therefore, petitioners claim, even though subsection (c)(2) is not a ceiling, expanding the program access rules beyond satellite programming is impermissible because "[b]y starkly and specifically exempting a small category of programming, Congress made clear that it did not wish that category to be subject to the specified rules." Pet'rs' Br. 36–37. To illustrate the point, petitioners offer an analogy. Suppose Congress passed a statute requiring EPA to regulate emissions by "non-hybrid cars." Under such a statute, EPA could invoke its general rulemaking authority to promulgate additional emissions regulations, perhaps by regulating

emissions from non-hybrid trucks, but it would have no authority, according to petitioners, to regulate hybrid car emissions.

It does not follow, however, that just because Congress required mandatory minimum regulations for some technologies, it intended to exclude other technologies from regulation. Hardly clairvoyant, especially with respect to rapidly evolving technologies, Congress may well have targeted satellite programming in section 628(c)(2) simply because it was at the time far and away the dominant form of video programming and thus the focus of concerns about anticompetitive withholding. *See* Intervenors in Support of the Comm'n Br. 12 ("[T]errestrial delivery was rarely used when the statute was passed."). The legislative history sheds no light on Congress's intent, as there is neither any explanation in the House committee reports concerning its decision to use the term "satellite programming" rather than "video programming" nor any indication in the conference report that Congress adopted the House language to restrict the statute's coverage. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because mute intermediate legislative maneuvers are not reliable indicators of congressional intent." (internal quotation marks omitted)). To the contrary, the conference report emphasizes the statute's expansive goals, explaining that "the conferees expect the Commission to address and resolve the problems of unreasonable cable industry practices, including restricting the availability of programming and charging discriminatory prices to non-cable technologies." *See* H.R. Rep. No. 102-862, at 93, *reprinted in* 1992 U.S.C.C.A.N. at 1275. We thus see no justification for construing Congress's reference to satellite programming withholding in subsection (c)(2) as an effort to prevent the Commission from addressing similar

unfair practices that—two decades later—have either the purpose or effect that subsection (b) proscribes. *See NCTA*, 567 F.3d at 665 ("The Commission's remedial powers . . . extend beyond the kinds of unfair-dealing interventions Congress specifically foresaw.").

Moreover, even were there reason to believe that Congress deliberately phrased subsection (c)(2) to exclude terrestrial programming, as opposed to simply using a term that captured the overwhelming majority of video programming at the time, we still see nothing in the statute that would unambiguously preclude the Commission from extending its rules to terrestrial programming on a case-by-case basis. Congress may well have wanted to avoid dictating the rules the Commission must adopt for a nascent technology while leaving it with authority to act should regulation prove necessary. Petitioners' "non-hybrid car" analogy overlooks this possibility.

For similar reasons, we reject petitioners' second argument—that by leaving terrestrial programmers off the list of entities covered by section 628(b), Congress unambiguously placed terrestrially delivered programming beyond Commission jurisdiction. Much like petitioners' first argument, this contention fails because it establishes nothing more than that when enacting the Cable Act, Congress was not attuned to the possibility that vertically integrated cable companies would engage in anticompetitive conduct regarding terrestrial programming. When Congress delegates broad authority to an agency to achieve a particular objective, agency action pursuant to that delegated authority may extend beyond the specific manifestations of the problem that prompted Congress to legislate in the first place. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 297–99 (D.C. Cir. 2003) (rejecting a *Chevron* step one challenge contending

that the Commission's statutory authority was limited to only the immediate concern Congress empowered the Commission to address and indicating that the use of "broad language" to solve a relatively specific problem "militates strongly in favor of giving [the statute] broad application"). In this case, although Congress may not have "foreseen the development of [terrestrial delivery]," section 628's expansive language suggests that it intended to give the Commission sufficient flexibility "to maintain . . . a grip on the dynamic aspects of [video programming]" so that it could pursue the statute's objectives as industry technology evolves. *United States v. Sw. Cable Co.*, 392 U.S. 157, 172 (1968) (internal quotation marks omitted); *see also Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) ("While the Congresses that drafted [section] 202(a)(1) [of the Clean Air Act] might not have appreciated the possibility that burning fossil fuels could lead to global warming, they did understand that without regulatory flexibility, changing circumstances and scientific developments would soon render the . . . Act obsolete. The broad language of [section] 202(a)(1) reflects an intentional effort to confer the flexibility necessary to forestall such obsolescence.").

Petitioners also claim that the supposedly poor fit between section 628(b) and the regulation of terrestrial programming withholding has led the Commission to adopt liability rules that are arbitrary, capricious, or otherwise unlawful. We address their specific objections in Part IV. For present purposes, it suffices to note that even if the Commission acted unlawfully by, for example, establishing vicarious liability for cable operators based on the conduct of affiliated terrestrial programmers, that would provide no reason for barring the Commission from holding liable cable operators and satellite programming vendors when they

engage *directly* in unfair conduct that has the purpose or effect the statute proscribes.

Finally, we are unpersuaded by petitioners' contention that the Commission lacks authority to regulate terrestrial programming withholding under section 628(b) because, in their view, the effect of such withholding on the provision of satellite programming is too attenuated. According to petitioners and their supporting intervenor, section 628(b) gives the Commission authority to regulate practices that prevent or significantly impair an MVPD from either *obtaining* satellite programming (which the subsection (c)(2) program access rules address) or *delivering* satellite programming to customers (which the MDU order in *NCTA* dealt with). Terrestrial programming withholding, they insist, has no effect on a rival MVPD's ability either to obtain satellite programming or to deliver such programming because even when cable-affiliated terrestrial programmers refuse to share, the MVPD remains fully able to make satellite programming available to interested customers. Acknowledging that terrestrial programming withholding may limit the number of customers an MVPD can attract, thus reducing its market share, petitioners contend that commercial attractiveness has nothing to do with whether the MVPD can provide satellite programming.

The problem with petitioners' argument is that it wrongly assumes an MVPD's lack of commercial attractiveness will never prevent or significantly hinder it from providing satellite programming. Indeed, as explained above, *see supra* pp. 4–5, Congress enacted section 628 largely on the theory that "exclusive arrangements" for programming "may tend to establish a barrier to entry and inhibit the development of competition in the market." S. Rep. No. 102-92, at 28 (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1161; *see also*

*Cablevision*, 597 F.3d at 1308 (discussing the Commission's 1990 report that led Congress to adopt section 628 and summarizing the Commission's view that "the cable operators' monopolies in the MVPD market persisted partly because competitors were unable to secure programming owned by vertically integrated cable companies"). When a vertically integrated cable programmer limits access to programming that customers want and that competitors are unable to duplicate—like the games of a local team selling broadcast rights to a single sports network—competitor MVPDs will find themselves at a serious disadvantage when trying to attract customers away from the incumbent cable company. To use a concrete example, we doubt that Philadelphia baseball fans would switch from cable to an alternative MVPD if doing so would mean they could no longer watch Roy Halladay, Cliff Lee, Roy Oswalt, and Cole Hamels take the mound, even if they thought the alternative MVPD was otherwise superior in terms of price and quality. Facing such a structural disadvantage, a potential MVPD competitor might realistically conclude that expanding its presence in the Philadelphia market would be uneconomical, thus limiting its ability to provide video programming—and hence satellite video programming—to customers.

Another hypothetical proves the point. Suppose the impact of withholding a particular cable-affiliated terrestrial programming network in a particular market is so great that it drives existing non-cable MVPDs completely out of the market and keeps others from entering. In that case, no one would doubt that terrestrial programming withholding prevented MVPDs from providing satellite programming. Just as "if you can't serve a building then you can't deliver satellite . . . programming," *NCTA*, 567 F.3d at 664 (internal quotation marks omitted), if you can't enter or survive in a market, then you can't deliver satellite programming in that

market. Petitioners conceded at oral argument that the Commission would possess section 628(b) authority in such a case, but they insisted there is no evidence that terrestrial withholding has ever made it completely impossible for potential competitors to enter or survive in a market. *See* Oral Arg. Tr. at 6:19–8:10. Of course, petitioners are right about this: the Commission has never suggested that there are situations in which terrestrial withholding has completely prevented an MVPD from serving a market. But given petitioners' concession that the Commission can in principle regulate terrestrial withholding when such withholding completely prevents an MVPD from competing, thus preventing that MVPD from providing satellite programming, they have no basis for arguing that section 628 *unambiguously* precludes the Commission from regulating where it has evidence that such withholding "hinder[s] significantly," 47 U.S.C. § 548(b), an MVPD from competing with the incumbent cable operator to deliver satellite programming to customers.

Before leaving *Chevron* step one, we pause to consider petitioners' additional argument that we may not defer to the Commission's interpretation of section 628(b) because extending the program access rules to terrestrial programming "raises grave constitutional questions." Petr's' Br. 41 (internal quotation marks omitted). Although the canon of constitutional avoidance does indeed "trump[] *Chevron* deference," we "do not abandon *Chevron* deference at the mere mention of a possible constitutional problem." *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008). In any event, as we explain in Part III, there is nothing to avoid.

Having rejected petitioners' arguments that section 628(b) unambiguously forecloses the Commission's

interpretation, we are left to decide whether that interpretation is reasonable under *Chevron* step two's "highly deferential standard." *Nat'l Rifle Ass'n of Am., Inc. v. Reno*, 216 F.3d 122, 137 (D.C. Cir. 2000). It is. As the Commission explained, through section 628 "Congress intended to encourage entry and facilitate competition in the video distribution market by existing or potential competitors to traditional cable systems by, among other things, making available to those entities the programming they need to compete in the video distribution market." *2010 Order*, 25 FCC Rcd. at 754 ¶ 13. And according to the Commission, terrestrially delivered programming, or at least some kinds of terrestrial programming like RSNs that are both non-replicable and highly coveted, have become necessary for MVPDs to compete fully with vertically integrated cable companies. *Id.* at 768–71 ¶¶ 32–35. Petitioners have given us no reason to disturb the Commission's effort to pursue Congress's objectives as the video distribution industry evolves.

Relying on language from *NCTA*, petitioners argue that the Commission's interpretation of section 628(b) creates "the specter of a statutory grant without bounds" because by interpreting a statute focused on the provision of satellite programming to authorize terrestrial withholding regulations, the Commission has "stray[ed] so far from the paradigm case as to render its interpretation unreasonable, arbitrary, or capricious." 567 F.3d at 665. In our view, however, the Commission has "barely reached beyond the paradigm case at all." *Id.* at 666. Indeed, the order at issue here actually aligns more closely with Congress's core purpose in enacting section 628 than did the MDU order. After all, preventing vertically integrated cable companies from engaging in unfair dealing over programming, precisely the conduct the challenged order addresses, was the primary reason Congress enacted section

628. *See id.* at 663 (acknowledging that "Congress's primary purpose in enacting section 628 was . . . to expand competition for programming, not service").

Finally, in addition to challenging the substance of the Commission's interpretation, petitioners argue that prior to issuing the challenged order, the Commission had taken the position that it lacked authority to regulate terrestrial programming, and that it departed from that position without acknowledgment. *See FCC v. Fox Television Stations, Inc.*, __U.S.__, 129 S. Ct. 1800, 1810–11 (2009) (holding that although the APA imposes no heightened standard of judicial review when an agency changes its position, "the requirement that an agency provide reasoned explanation for its action [will] ordinarily demand that it display awareness that it *is* changing position"). In its order, however, the Commission pointed out that it had recognized that complaints concerning terrestrial withholding might, under some circumstances, be cognizable under subsection (b). *See 2010 Order*, 25 FCC Rcd. at 759–60 & n.80 ¶ 22. True, the Commission also acknowledged that some decisions by its former Cable Services Bureau could be read to suggest that subsection (c)(2) affirmatively limits the Commission's ability to regulate terrestrial withholding. *See id.* at 759–60 & n.77 ¶ 22 (collecting Bureau decisions indicating "that [s]ection 628(b) may not be used categorically to preclude programming practices that are related to practices" that subsection (c)(2) addresses but does not reach). But the Commission explained that not only are the Bureau's statements distinguishable from the present order—they addressed only the permissibility of an across-the-board ban on terrestrial withholding—but also "staff-level" Bureau decisions "are not binding on the Commission." *Id.* at 760 ¶ 22. The Commission added that even if prior decisions could be read to preclude "consideration of program access complaints involving

terrestrially delivered, cable-affiliated programming," it was now "reject[ing] that view." *Id.* Given the care the Commission took to explain its prior actions, we see no basis for concluding that it "casually ignored" prior policies and interpretations or otherwise failed to provide a reasoned explanation for its order. *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (internal quotation marks omitted).

## III.

Petitioners next contend that the Commission's order violates the First Amendment, both on its face and as applied, because the program access rules for terrestrial programming burden the speech and association rights of cable operators and video programmers. As to that claim, this court has already done much of the heavy lifting. In *Time Warner Entertainment Co. v. FCC*, 93 F.3d 957, 977–78 (D.C. Cir. 1996) (per curiam), we held that intermediate scrutiny applied to a facial challenge to the Commission's satellite programming access rules established pursuant to section 628(c)(2). Under that standard, we will sustain a regulation if " 'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' " *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). Concluding that regulating vertically integrated programmers and operators to promote competition in the video marketplace "furthers an important government interest [that] is unrelated to the suppression of free expression" and that subsection (c)(2)'s restrictions did not "burden substantially more speech than is necessary to further" that interest, we upheld the Commission's program access rules against a facial challenge.

*Time Warner*, 93 F.3d at 978–79 (internal quotation marks omitted).

In this case, therefore, we apply intermediate scrutiny to the Commission's order, recognizing that we have already concluded that its asserted justification—promoting competition in the MVPD market—represents an important governmental interest. Of course, just because the government's "asserted interests are important in the abstract does not mean" that the Commission's terrestrial programming withholding rules "will in fact advance those interests." *Turner Broad. Sys.*, 512 U.S. at 664. "When the [g]overnment defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must . . . demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* Pointing to dramatic changes in the video programming industry since Congress passed the Cable Act in 1992, and in particular to significant gains in market share enjoyed by MVPD competitors to cable, petitioners contend that the Commission's imposition of *any* program access obligations no longer serves an important governmental interest and therefore violates the First Amendment. "At a minimum," they assert, the extension of program access rules to terrestrially delivered programming fails intermediate scrutiny because "competition in the MVPD industry has flourished even though terrestrial programming was never required to be shared." Pet'rs' Br. 32.

The video programming industry does indeed look very different today than it did when Congress passed the Cable Act in 1992. *See Cablevision*, 597 F.3d at 1313–14 ("It is true that the MVPD market has transformed substantially since the Cable Act was enacted in 1992."); *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) (describing the "overwhelming

evidence concerning the dynamic nature of the communications marketplace, and the entry of new competitors at both the programming and the distribution levels" (internal quotation marks and citation omitted)). Although cable operators then controlled approximately 95% of the national market for video programming, *see Cablevision*, 597 F.3d at 1309, by 2007 their share had decreased to 67%, and it has apparently continued dropping in the face of competition from DBS providers and, more recently, from telephone companies offering fiber optic services, *see 2010 Order*, 25 FCC Rcd. at 763 ¶ 27. In addition, the number of programming networks has increased dramatically while the percentage of networks vertically integrated with cable operators has declined. *See Cablevision*, 597 F.3d at 1309, 1314.

Contrary to petitioners' argument, however, these market changes do not mean that the Commission's order fails intermediate scrutiny. By imposing liability only when complainants demonstrate that a company's unfair act has "the purpose or effect" of "hinder[ing] significantly or . . . prevent[ing]" the provision of satellite programming, 47 U.S.C. § 548(b), the Commission's terrestrial programming rules specifically target activities where the governmental interest is greatest. Accordingly, to survive intermediate scrutiny in this facial challenge, the Commission need show only that vertically integrated cable operators remain dominant in *some* video distribution markets, that the withholding of highly desirable terrestrially delivered cable programming, like RSNs, inhibits competition in those markets, and that providing other MVPDs access to such programming will "promot[e] . . . fair competition in the video marketplace." *Time Warner*, 93 F.3d at 978. The Commission has no obligation to establish that vertically integrated cable companies retain a stranglehold on

competition nationally or that all withholding of terrestrially delivered programming negatively affects competition. For these reasons, petitioners' reference to the Commission's *extending* its program access rules by closing the terrestrial loophole is a red herring. Although it is true that competition in the MVPD industry has generally increased even absent rules restricting terrestrial withholding, nothing prevents the Commission from addressing any remaining barriers to effective competition with appropriately tailored remedies.

With our inquiry thus focused, we believe that the Commission's order serves an important governmental interest and that the Commission has satisfied its constitutional burden under intermediate scrutiny. As we observed in *Cablevision Systems Corp. v. FCC*, the transformation in the MVPD market, although significant, presents a "mixed picture" when considered as a whole. 597 F.3d at 1314. Relying on the record from the Commission's 2007 program access order extension for satellite programming, *see supra* p. 7, we observed that not only do cable operators still control some two-thirds of the market nationally, but also that they enjoy higher shares in several markets. *See Cablevision*, 597 F.3d at 1314. We further recognized that clustering and consolidation in the industry bolsters the market power of cable operators because "a single geographic area can be highly susceptible to near-monopoly control by a cable company." *Id.* at 1309. On the programming side, we cited the Commission's finding that despite major gains in the amount and diversity of programming, as of 2007 "the four largest cable operators [were] still vertically integrated with six of the top 20 national networks, some of the most popular premium networks, and almost half of all regional sports networks." *Id.* at 1314. In the order at issue here, the Commission reaffirmed these observations about the MVPD market, finding "no evidence

. . . that market shares have changed materially since" 2007, and concluding that "cable operators still have a dominant share of MVPD subscribers," that "there is evidence that cable prices have risen in excess of inflation," and that "cable operators still own significant programming." *2010 Order*, 25 FCC Rcd. at 763, 776 ¶¶ 27, 42. Petitioners have given us no reason to question these findings.

Moreover, the Commission's 2006 regression analysis concerning the withholding of terrestrially delivered, cable-affiliated RSN programming in the Philadelphia and San Diego markets demonstrates that vertically integrated cable companies can in fact withhold terrestrially delivered programming to limit the market share of rival MVPDs. Applying APA review, we relied on this study in *Cablevision* to reject a challenge to the Commission's five-year extension of its prohibition on exclusive contracts for satellite programming between cable operators and cable-affiliated programmers for satellite programming. *See Cablevision*, 597 F.3d at 1314 (recognizing that "predictive calculations are a murky science" and deferring to the agency's expert view of the evidence). First Amendment intermediate scrutiny is, of course, substantially more demanding than arbitrary and capricious review of agency action. *See Century Commc'ns Corp. v. FCC*, 835 F.2d 292, 299 (D.C. Cir. 1987). But given how directly this study supports the Commission's present order, which adopts case-by-case restrictions on terrestrial programming, as compared to the Commission's earlier decision, which extended the general ban on exclusive contracts for cable-affiliated satellite programming, we give the study significant weight here as well.

Petitioners also contend, though somewhat in passing, that the Commission's order is unconstitutionally underinclusive because it applies only to cable operators, not

to *all* MVPDs. But the Commission's terrestrial programming rules, like all of its section 628 regulations, focus on vertically integrated cable companies due to their " 'special characteristics' " and their unique ability to impact competition. *See Time Warner*, 93 F.3d at 978 (quoting *Turner Broad. Sys.*, 512 U.S. at 660–61). Were the Commission to persist in regulating only the conduct of cable operators in the face of evidence that exclusive dealing arrangements involving other MVPDs have similar negative impacts on competition, then our analysis would necessarily change. But nothing in the present record suggests such unjustified discrimination. Indeed, far from neglecting the issue, the Commission reported that it is considering whether to expand its exclusive contract prohibition to programmers affiliated with non-cable MVPDs. *See 2010 Order*, 25 FCC Rcd. at 777 ¶ 45. We therefore decline to strike down the Commission's order as "fatally underinclusive simply because an alternative regulation, which would restrict *more* speech or the speech of *more* people, could be more effective." *Blount v. SEC*, 61 F.3d 938, 946 (D.C. Cir. 1995).

Finally, petitioners argue that given the robust competition in the New York City video market where they operate, the Commission's terrestrial programming rules are unconstitutional as applied to them. According to the Commission, however, this as-applied preenforcement challenge is unripe for judicial review. "In applying the ripeness doctrine," we look to "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Munsell v. Dep't of Agric.*, 509 F.3d 572, 585–86 (D.C. Cir. 2007) (internal quotation marks omitted). We agree with the Commission that this particular challenge is unfit for review because there is no way of knowing whether the Commission's new restrictions, which it will base on case-by-case determinations, will even

apply to petitioners. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks omitted)). Indeed, as the Commission observes, if petitioners are correct about the state of competition in the market they serve, then, should they face an enforcement proceeding, they will have powerful evidence that their terrestrial programming withholding has no significant impact on the delivery of satellite programming. In any event, because petitioners' as-applied challenge depends on facts about the New York City market that are absent from the administrative record, we believe that "further factual development" in a ruling by the Commission with respect to a specific complaint would "significantly advance our ability to deal with the legal issues presented." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (internal quotation marks omitted). As to hardship, the possibility that petitioners may need to defend their terrestrial withholding practices in a proceeding before the Commission is insufficient to outweigh the strong institutional interests favoring postponing judicial review of such a fact-bound constitutional question. *See Fed. Express Corp. v. Mineta*, 373 F.3d 112, 118 (D.C. Cir. 2004) ("In applying the ripeness doctrine to agency action we balance the interests of the court and the agency in delaying review against the petitioner's interest in prompt consideration of allegedly unlawful agency action." (internal quotation marks omitted)).

## IV.

We now move on to consider petitioners' challenges to several specific aspects of the Commission's order. Recall that the order allows complainants to bring claims against cable operators or covered satellite programmers for engaging in section 628(c)(2)-like conduct involving terrestrial

programming. Complainants must then demonstrate that the cable operator or satellite programmer's unfair act has "the purpose or effect of . . . hinder[ing] significantly or . . . prevent[ing]" the provision of satellite programming to customers. 47 U.S.C. § 548(b). When RSN programming is at issue, including RSN HD programming, petitioners may invoke a rebuttable presumption that the unfair act of withholding has such a purpose or effect. *See 2010 Order*, 25 FCC Rcd. at 782–85 ¶¶ 52–55. In addition, in cases involving alleged discriminatory conduct by a cable-affiliated programmer providing only terrestrially delivered programming, complainants must establish that the programmer is wholly owned by, controlled by, or under common control with the cable operators or covered satellite programming vendors against whom the complaint is filed. *See id.* at 786–87 ¶ 57.

Petitioners challenge the order's rebuttable presumptions and its liability rules, as well as the Commission's determination that all section 628(c)(2)-like conduct involving terrestrial programming is "unfair" as that term is used in subsection (b). We review petitioners' challenges to the Commission's decisionmaking process under the APA, upholding its actions unless they are " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or not supported by 'substantial evidence.' " *NetworkIP, LLC v. FCC*, 548 F.3d 116, 121 (D.C. Cir. 2008) (quoting 5 U.S.C. § 706(2)). An agency decision is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983). APA review is "very deferential," *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), especially where, as here, "the decision under review requires expert policy judgment of a technical, complex, and dynamic subject," *Cablevision*, 597 F.3d at 1311. To the extent petitioners' specific challenges are statutory or constitutional, we apply the relevant standards of review as described above. *See supra* Parts II & III.

Before considering petitioners' specific arguments, however, we must address the Commission's threshold contention that they are unripe for judicial review. In contrast to our conclusion regarding petitioners' as-applied First Amendment claim, we believe that these challenges are ripe even though the Commission has yet to apply its new rules in individual proceedings. All of petitioners' challenges, including their APA claims, raise purely legal questions, and we have "often observed that a purely legal claim in the context of a facial challenge . . . is presumptively reviewable." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (internal quotation marks omitted). Most significantly—and this is what clearly distinguishes these challenges from petitioners' as-applied First Amendment argument—the legality of the rules at issue is generally "not 'intertwined with how the Commission might exercise its discretion in the future.' " *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 464–65 (D.C. Cir. 2006) (quoting *Sprint Corp. v. FCC*, 331 F.3d 952, 954 (D.C. Cir. 2003)). Although the order does reserve some matters for case-by-case adjudication, the portions that petitioners challenge—such as the Commission's determination that section 628(c)(2)-like conduct involving terrestrial programming is always unfair, *see 2010 Order*, 25 FCC Rcd. at 779–80 ¶ 49—have been finally resolved and will not be at issue in individual enforcement proceedings.

*See Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1032 (D.C. Cir. 1987) ("That some issues are unresolved does not in itself render unfit the ones that the agency has clearly determined."). Moreover, in contrast to *Sprint Corp. v. FCC*, on which the Commission relies, petitioners' claims "rest[] not on the assumption that the [Commission] will exercise its discretion unlawfully in applying the regulation but on whether its *faithful* application would" violate the law. *Nat'l Ass'n of Home Builders*, 440 F.3d at 465 (internal quotation marks omitted) (distinguishing *Sprint Corp.*). For these reasons, we feel well equipped to resolve these legal questions now and see no reason for believing that our review would materially benefit from a more "concrete setting." *Id.* at 464.

In addition to its general ripeness argument, the Commission contends that petitioners' challenges to the order's rebuttable presumptions are especially premature. To be sure, *as-applied* challenges to the use of rebuttable presumptions are generally unfit for review before the agency has actually implemented them. *See S. Co. Servs., Inc. v. FCC*, 313 F.3d 574, 581–82 (D.C. Cir. 2002). But whether rebuttable presumptions are *facially* unreasonable presents a distinct question that courts, depending on the nature of the presumption and the development of the record, might well be able to address prior to enforcement. *Compare, e.g.*, *Fed. Express Corp.*, 373 F.3d at 118–19 (concluding that accounting presumptions for air carrier compensation were unripe for review), *with Nat'l Mining Ass'n v. Babbitt*, 172 F.3d 906, 909–13 (D.C. Cir. 1999) (reviewing and finding arbitrary and capricious the Secretary of the Interior's adoption of a rebuttable presumption as to the cause of damage resulting from earth movement near underground mines). In this case, the administrative record is sufficiently developed to allow us to review the facial reasonableness of

the Commission's rebuttable presumptions even before knowing how those presumptions will actually be applied.

Where "no institutional interests favor[] postponement of review, a petitioner need not satisfy the hardship prong" of our ripeness test. *AT&T Corp. v. FCC*, 349 F.3d 692, 700 (D.C. Cir. 2003); *see also Teva Pharm. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1310 (D.C. Cir. 2010) (collecting cases indicating that "hardship is not a *sine qua non* of ripeness"). Even so, to the extent the Commission's rules may make it more likely that petitioners' terrestrial withholding will be found unlawful, they create an incentive for petitioners to alter their business affairs, establishing at least some degree of hardship.

*Rebuttable presumptions for RSN and RSN HD programming*

Under the APA, agencies may adopt evidentiary presumptions provided that the presumptions (1) shift the burden of production and not the burden of persuasion, *see Garvey v. Nat'l Transp. Safety Bd.*, 190 F.3d 571, 579–80 (D.C. Cir. 1999) (explaining that section 7(c) of the APA, 5 U.S.C. § 556(d), forbids only the latter), and (2) are rational, *see id.* at 579. Reviewing the Commission's order, we think it clear that its rebuttable presumptions shift only the burden of production. *See 2010 Order*, 25 FCC Rcd. at 783 ¶ 52 ("[W]e will not require litigants and the Commission staff to undertake repetitive examinations of our RSN precedent and the relevant historical evidence. Instead, we recognize the weight of the existing precedent and categorical evidence concerning RSNs by allowing complainants to invoke a rebuttable presumption that an unfair act involving a terrestrially delivered, cable-affiliated RSN has the purpose or effect set forth in [s]ection 628(b)."). Given that petitioners' challenge on this point is purely facial, we have no occasion to consider whether the Commission's rebuttable

presumptions might function differently in practice. *See Associated Gas Distribs.*, 824 F.2d at 1032–33 (declining to review a claim that agency regulations adopting a rebuttable presumption would "illegally switch[] the burden of proof" because of the "highly abstract and speculative character" of that allegation).

Turning to the question of whether the Commission's rebuttable presumptions are rational, we "must defer to the agency's judgment, but an evidentiary presumption is only permissible if there is a sound and rational connection between the proved and inferred facts, and when proof of one fact renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of [the inferred] fact . . . until the adversary disproves it." *Nat'l Mining Ass'n v. Dep't of Interior*, 177 F.3d 1, 6 (D.C. Cir. 1999) (internal citation and quotation marks omitted). According to petitioners, the challenged presumptions flunk this test because, they say, the record contains insufficient evidence that subsection 628(c)(2)-like conduct involving RSN terrestrial programming will significantly hinder the provision of satellite cable programming. In particular, they criticize the Commission's extrapolation from its 2006 regression analysis, arguing not only that the study is both weak and dated, but also that the Commission made no effort to consider whether the study's sample, which involved exclusive contracts for programming networks showing professional sports teams, is representative of terrestrial RSNs generally. Supporting intervenor NCTA argues that the breadth of the Commission's definition of RSNs, which extends to networks that carry at least 10% of a team's games (including Division I college football and basketball teams that play fewer games than professional teams), exacerbates this problem. *See 2010 Order*, 25 FCC Rcd. at 783–84 ¶ 53 (defining RSN).

Although petitioners' objections have some force, we believe they are overcome by "the substantial deference we owe the FCC's predictive judgments." *Nuvio Corp. v. FCC*, 473 F.3d 302, 306 (D.C. Cir. 2006). To begin with, relying on its expertise and wealth of experience, the Commission advanced compelling reasons to believe that withholding RSN programming is, given its desirability and non-replicability, uniquely likely to significantly impact the MVPD market. *See 2010 Order*, 25 FCC Rcd. at 750, 782–83 & n.205 ¶¶ 9, 52; *see also In re Gen. Motors Corp. & Hughes Elecs. Corp., Transferors & the News Corp. Ltd., Transferee*, 19 FCC Rcd. 473, 535 ¶ 133 (2004) ("RSNs[] typically purchase exclusive rights to show sporting events and sports fans believe that there is no good substitute for watching their local and/or favorite team play an important game."), *modified*, 24 FCC Rcd. 8674 (2009). Moreover, despite its limitations, the Commission's 2006 regression analysis constitutes substantial evidence that supports the Commission's adoption of a presumption. "We generally defer to an agency's decision to proceed on the basis of imperfect scientific information, rather than to invest the resources to conduct the perfect study." *Sierra Club v. EPA*, 167 F.3d 658, 662 (D.C. Cir. 1999) (internal quotation marks omitted); *see also City of Los Angeles v. U.S. Dep't of Transp.*, 165 F.3d 972, 977 (D.C. Cir. 1999) ("In reviewing the [Commission's] order, we do not sit as a panel of referees on a professional economics journal, but as a panel of generalist judges obliged to defer to a reasonable judgment by an agency acting pursuant to congressionally delegated authority."). Particularly given the Commission's expert observations about RSN programming, it reasonably extrapolated from this study to a prediction about the impact RSN withholding would ordinarily have. Indeed, in *Cablevision* we permitted the Commission to extrapolate from this same study to a much greater degree.

*See supra* p. 28. Although the study involved only RSNs, the Commission used it to support predictions about the effects lifting its ban on satellite programming withholding would have for satellite cable-affiliated networks generally, including for national networks. *See* 597 F.3d at 1314.

We likewise find reasonable the Commission's decision to extend its rebuttable presumption to RSN HD programming. Citing consumer survey data, evidence from cable operators' marketing campaigns touting the carriage of HD programming, and record comments describing the rapidly growing demand for HD televisions, the Commission found that "the record shows that MVPD subscribers do not consider [standard definition (SD)] programming to be an acceptable substitute for HD programming" and that "HD programming has thus become an important part of a competitive MVPD offering." *2010 Order*, 25 FCC Rcd. at 784–85 ¶ 54. Given this evidence, as well as the respect we owe Commission efforts to anticipate the effects of technological change in a dynamic market, the Commission's determination that the impact of RSN SD programming withholding will extend to RSN HD programming "is a predictive judgment that [the agency] is entitled to make and to which we defer." *Charter Commc'ns, Inc. v. FCC*, 460 F.3d 31, 44 (D.C. Cir. 2006).

Petitioners also challenge the Commission's rebuttable presumptions on First Amendment grounds. These arguments fare no better. Petitioners' contention that the Commission's presumptions are impermissibly content-based and therefore deserve strict scrutiny is meritless. Although the presumptions "might in a formal sense be described as content-based" given that they are triggered by whether the programming at issue involves sports, there is absolutely no evidence, nor even any serious suggestion, that the Commission issued its regulations

to disfavor certain messages or ideas. *See BellSouth Corp. v. FCC*, 144 F.3d 58, 69 (D.C. Cir. 1998). The clear and undisputed evidence shows that the Commission established presumptions for RSN programming due to that programming's economic characteristics, not to its communicative impact. Thus content-neutral, the presumptions are subject only to intermediate scrutiny. *See id.* (" 'Government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech.' " (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989))). Finally, petitioners' argument that the presumptions are too broad to survive even intermediate scrutiny is equally meritless. Given record evidence demonstrating the significant impact of RSN programming withholding, the Commission's presumptions represent a narrowly tailored effort to further the important governmental interest of increasing competition in video programming. *See Turner Broad. Sys.*, 512 U.S. at 662.

*Potentially liable entities*

Petitioners contend that the Commission acted unlawfully by providing that it may hold satellite cable programming vendors liable for acts of terrestrial programming withholding under section 628(b). According to petitioners, when an entity engages in conduct with respect to terrestrial programming, it is not, as section 628(i)(2) requires, "engaged in the . . . distribution . . . of satellite cable programming," 47 U.S.C. § 548(i)(2), and so may not be held liable as a satellite cable programming vendor under section 628(b). We are unpersuaded. As we held in a case involving strikingly similar statutory language, "[t]here is nothing linguistically odd about defining a set of firms subject to regulation in terms of the conduct of particular activities, and yet also regulating some other activities that are not part of the definition." *WorldCom, Inc. v. FCC*, 246 F.3d 690, 693–95 (D.C. Cir. 2001) (holding

that the Commission had authority to regulate "local exchange carriers" when they provided DSL services even though the statute in question defined "local exchange carriers" to mean "any person that *is engaged* in the provision of telephone exchange service or exchange access"). In defining satellite cable vendors, Congress could have required that an entity would be covered "only 'when' or 'to the extent' that it provides the regulation-triggering services." *Id*; *see also* 47 U.S.C. § 153(51) ("A telecommunications carrier shall be treated as a common carrier under this Act *only to the extent* that it is engaged in providing telecommunications services . . . ." (emphasis added)). But as the Commission recognized in its order, Congress imposed no such limitation. *See 2010 Order*, 25 FCC Rcd. at 779 n.192 ¶ 49.

Petitioners argue that the Commission's interpretation of section 628(i)(2) leads to irrationally different treatment of similarly situated entities because it subjects programmers selling both satellite and terrestrial programming to liability while exempting programmers selling only terrestrial programming. Although we agree that section 628(b)'s omission of terrestrial programmers creates an odd gap, we reject petitioners' suggestion that the Commission must address this disparity by expanding the gap to also exempt dual programmers even though they (1) are covered by the literal terms of the statute as satellite programming vendors, and (2) can engage in conduct the statute expressly prohibits. Aware of this problem, the Commission has chosen to go in the opposite direction, relying on vicarious liability to regulate indirectly the conduct of terrestrial-only programmers. We turn, then, to the permissibility of that move.

In its order, the Commission established that when a terrestrial programmer is wholly owned by, controlled by, or

under common control with a cable operator or covered satellite programming vendor, the latter entity "can appropriately be held responsible for the discriminatory acts of its program supplier affiliate because it controls the supplier and the supplier's unfair actions are designed to benefit [the entity]." *2010 Order*, 25 FCC Rcd. at 786 ¶ 57; *see also* 47 C.F.R. § 76.1001(b)(1)(ii) (codifying this rule). Petitioners first argue that imposing liability on cable operators based on control or common control runs afoul of section 628 because such operators are liable under subsection (c)(2)(A) only when they "unduly or improperly influenc[e]" an affiliated programmer's decision. But for reasons explained at length in Part II, *see supra* pp. 14–17, subsection (c)(2)'s minimum requirements impose no affirmative limits on the Commission's ability to pursue its statutory objectives under subsection (b).

Petitioners next contend that the Commission engaged in arbitrary and capricious reasoning when it assumed that a terrestrial programmer who withholds programming from an MVPD always does so for the benefit of a commonly controlled cable operator even when that operator is no more than a sister subsidiary corporation. According to petitioners, that assumption fails to account for the possibility that a terrestrial programmer might enter an exclusive agreement with an unaffiliated MVPD. Such a deal, petitioners claim, would benefit only the unaffiliated MVPD (who gets the exclusive programming) and the terrestrial programmer itself (who secures an exclusivity premium). But the Commission has determined, reasonably in our view, that discriminatory practices by terrestrial programmers will often be intended in part to benefit a cable operator under common ownership. *See 2010 Order*, 25 FCC Rcd. at 786 ¶ 57. After all, the entire theory underlying section 628 and the Commission's implementing rules is that vertically integrated cable

programmers have incentives to enter arrangements favoring affiliated cable operators. *See supra* pp. 4–5. Even where programmers enter exclusivity arrangements with unaffiliated MVPDs, which petitioners do not suggest is nearly as common as deals between cable-affiliated entities, the programmer might enter the deal at least in part to benefit the affiliated cable operator by closing some rivals out of the market. For example, if a cable operator has one DBS competitor and one wireline competitor but considers the latter a greater threat to its dominant position, exclusive arrangements between an affiliated terrestrial programmer and the DBS company that keep must-have programming from the wireline company will redound to the cable operator's benefit.

Advancing a third argument, petitioners contend that section 628(b)'s plain language precludes vicarious liability because that provision only prohibits a cable operator from "engag[ing] in," 47 U.S.C. § 548(b), certain conduct, which, according to petitioners, presupposes direct liability. But because petitioners first raised this argument in their reply brief, we treat it as forfeited. *See Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 123 (D.C. Cir. 2010).

*Treating all section 628(c)(2)-like conduct involving terrestrial programming as "unfair"*

This brings us finally to petitioners' contention that the Commission erred by concluding that section 628(c)(2)-like conduct involving terrestrial programming constitutes "unfair methods of competition or unfair or deceptive acts or practices within the meaning of [s]ection 628(b)." *2010 Order*, 25 FCC Rcd. at 779 ¶ 49 (internal quotation marks omitted). In reaching this judgment, the Commission relied primarily on the fact that in proscribing such conduct in section 628(c)(2), Congress had implicitly treated it as unfair. By "defin[ing] certain conduct that must be included in the

Commission's implementing regulations," the Commission asserted, "Congress . . . made a conclusive legislative judgment that the categories of conduct involving satellite-delivered programming that are enumerated in [s]ection 628(c)(2) satisfy the requirements of [s]ection 628(b), including the requirement of constituting an 'unfair method[] of competition or unfair or deceptive act[] or practice[].' " *Id.* at 778 ¶ 47 (quoting 47 U.S.C. § 548(b)). Defending its analysis here, the Commission maintains that given subsection (c)(2), it "made sense for the Commission to conclude that the mirror image of these acts in the nearly identical context of terrestrially delivered programming also should be 'unfair acts' for purposes of [s]ection 628(b)." Resp'ts' Br. 49.

The Commission's reasoning by analogy has several serious gaps. To begin with, it failed to justify its assumption that just because Congress treated certain acts involving satellite programming as unfair, the same acts are necessarily unfair in the context of terrestrial programming. Although we hold in this opinion that subsection (c)(2)'s focus on satellite programming in no way restricts the Commission from regulating terrestrial programming, *see supra* pp. 14–17, it is a different matter entirely for the Commission to assume that apparent congressional judgments regarding satellite programming necessarily apply in precisely the same way to terrestrial programming. Of course, for purposes of evaluating whether conduct within the video industry is unfair, it might well be that nothing turns on the technology used to deliver programming to MVPDs. That said, terrestrial programming is typically local and regional, whereas satellite programming includes national networks. *See 2010 Order*, 25 FCC Rcd. at 764 n.98 ¶ 27. Which way this geographic distinction cuts is a question we leave for the Commission to resolve in the first instance. On the one hand, the Commission cited evidence

that certain local and regional video distribution markets are significantly less competitive than the national market, making programming withholding in those markets "potentially an even more profitable strategy" than is typically the case. *Id.* at 763–64 & n.99 ¶ 27. On the other hand, the Commission recognized that "exclusivity plays an important role in the growth and viability of local cable news networks and that permitting such exclusivity should not . . . dissuade new MVPDs from developing their own competing regional programming services." *Id.* at 781 n.200 ¶ 51 (internal quotation marks omitted). For our purposes, the point is simply that the Commission needs to consider whether there are relevant differences between satellite and terrestrial programming before invoking Congress's regulation of satellite withholding as a justification for treating terrestrial withholding as categorically unfair.

Moreover, not only is the Commission's reasoning by analogy incomplete, but its central premise, as petitioners point out, is mistaken. In subsection (c)(2), Congress established broad program access rules for satellite programming, which suggests that Congress did believe that withholding such programming was generally unfair, at least given the state of the video market at the time. But Congress also recognized an important exception. It allowed cable operators and affiliated satellite programmers to enter exclusive programming contracts in markets previously served by cable if the Commission concluded, after receiving an exemption request, that the contract "is in the public interest." 47 U.S.C. § 548(c)(2)(D). By creating this exception, as well as by building a sunset provision into the exclusive contract prohibition, *id.* § 548(c)(5), Congress sought to balance the need for regulatory intervention in markets possessing significant barriers to competition with its recognition that vertical integration and exclusive dealing

arrangements are not always pernicious and, depending on market conditions, may actually be procompetitive. *See* S. Rep. No. 102-92, at 28, *reprinted in* 1992 U.S.C.C.A.N. at 1161 ("The Committee believes that exclusivity can be a legitimate business strategy where there is effective competition. Where there is no effective competition, however, exclusive arrangements may tend to establish a barrier to entry and inhibit the development of competition in the market."). Reflecting this balanced approach, section 628(c)(4)'s public interest factors direct the Commission to consider the effect of exclusive contracts on (1) "competition in local and national [MVPD] markets," (2) "competition from [MVPD] technologies," (3) "the attraction of capital investment in the production and distribution of new satellite cable programming," and (4) "diversity of programming in the [MVPD] market," as well as (5) "the duration of the exclusive contract." 47 U.S.C. § 548(c)(4).

Congress's framework accords with the generally accepted view in antitrust and other areas that exclusive contracts may have both procompetitive and anticompetitive purposes and effects. *See, e.g.*, *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 334–35 (1961) (finding that an exclusive dealing contract did not violate section 3 of the Clayton Act because it did not "foreclose competition in a substantial share of the line of commerce affected," and recognizing that potential procompetitive justifications for the contract were relevant to assessing its legality); *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) (en banc) ("Permitting an antitrust action to proceed any time a firm enters into an exclusive deal would . . . discourage a presumptively legitimate business practice. . . ."); 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1803a, at 100 (2d ed. 2005) (describing output contracts as "presumptively procompetitive"). Here, for example, "the ability to enter into

exclusive contracts could create economic incentives to invest in the development of new programming" by allowing a vertically integrated cable operator to differentiate its service and secure the benefits of creating and promoting its programming networks. *Time Warner*, 93 F.3d at 979. Indeed, the Commission itself has recognized that exclusivity can further competition in certain circumstances. *See In re Implementation of the Cable Television Consumer Prot. & Competition Act of 1992,* 22 FCC Rcd. 17791, 17835 ¶ 63 (2007) ("We recognize the benefits of exclusive contracts and vertical integration cited by some cable [companies], such as encouraging innovation and investment in programming and allowing for 'product differentiation' among distributors."). For instance, as noted above, the Commission has taken the position that "exclusivity plays an important role in the growth and viability of local cable news networks." *2010 Order*, 25 FCC Rcd. at 781 n.200 ¶ 51. Yet under the Commission's rules for terrestrial programming, exclusivity even in this context is "unfair."

The Commission responds that determining whether particular conduct is unfair represents only half the section 628(b) inquiry contemplated by their new regulations. Complainants must also show that an unfair act of terrestrial programming withholding has "the purpose or effect of . . . hinder[ing] significantly or . . . prevent[ing]" any MVPD from providing satellite programming to customers. 47 U.S.C. § 548(b). This case-by-case approach for terrestrial programming, the Commission contends, provides "an even broader 'escape valve' " for procompetitive or benign exclusive contracts than does the public interest exception for satellite programming. Resp'ts' Br. 51.

Of course, the Commission is correct that it has substantially narrowed the scope of its regulations by focusing

on the effect of terrestrial withholding in individual cases. Indeed, this is one reason why its rules survive First Amendment scrutiny. *See supra* pp. 26–27. But the case-by-case inquiry into purposes or effects may fail to capture whether a particular act of terrestrial withholding should be considered unfair. For example, although the Commission has indicated it is "highly unlikely that an unfair act involving local news and local community or educational programming will have the [proscribed] purpose or effect under [s]ection 628(b)"—because "[u]nlike RSN programming, local news and local community or educational programming is readily replicable by competitive MVPDs," *2010 Order*, 25 FCC Rcd. at 781 n.200 ¶ 51—the logic of the Commission's order dictates that should a complainant establish such a purpose or effect with respect to withholding by a terrestrially delivered local news network, then the Commission would require the network to share its programming. That result would follow even if the network's popularity and market impact stemmed from substantial investment in news content and advertising by the cable operator affiliated with the network, and even if MVPD competitors could duplicate those investments but have refrained from doing so. By contrast, if our hypothetical news network were delivered to MVPDs by satellite, the Commission would, if presented with an exemption application, consider whether an exclusive contract involving this programmer would be in the public interest despite the contract's negative impact on current free-riding competitors.

In addition to relying by analogy on the congressional judgment reflected in section 628(c)(2), the Commission indicated that subsection (c)(2)-like acts involving terrestrial programming are unfair because such acts "have the potential to impede entry into the video distribution market and to hinder existing competition in the market." *Id.* at 779 ¶ 48. But by labeling conduct unfair simply because it might in

some circumstances negatively affect competition in the video distribution market, the Commission failed to consider whether it should treat conduct as unfair despite it being procompetitive in a given instance. Indeed, even though reducing prices amounts to paradigmatic legitimate competition, a cable operator's decision to cut its prices could conceivably qualify under the Commission's reasoning as "unfair" under section 628(b) because of the theoretical "potential" for a cable operator to engage in predatory pricing to drive its competitors from the market.

Given the Commission's failure to "articulate a satisfactory explanation for its action" in defining certain acts of terrestrial withholding as categorically unfair, this part of its terrestrial programming order is arbitrary and capricious. *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43; *see also Kristin Brooks Hope Ctr. v. FCC*, 626 F.3d 586, 589–91 (D.C. Cir. 2010) (vacating a Commission decision as arbitrary and capricious for failure to provide "a reasonable explanation"). That said, we take no position on the ultimate issue of exactly how the Commission should define the inherently ambiguous statutory term "unfair." *See Chevron*, 467 U.S. at 842–43. But if the Commission believes that conduct involving the withholding of terrestrial programming should be treated as categorically unfair, as opposed to assessing fairness on a case-by-case basis or perhaps adopting a public interest exception mirroring the one for satellite programming, *see* 47 U.S.C. § 628(c)(2)(D), (c)(4), then it must grapple with whether its definition of unfairness would apply to conduct that appears procompetitive and, if so, whether that result would comport with section 628.

## V.

The petitions for review are denied in part and granted in part. We vacate that portion of the Commission's order

treating certain acts of terrestrially delivered programming withholding as categorically unfair and remand to the Commission for further proceedings consistent with this opinion.

*So ordered.*